[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 6, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12537

_____

D. C. Docket No. 05-00266-CR-003-WHS

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

PATRICK LETT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(April 6, 2007)**

Before CARNES, PRYOR and FARRIS,[*] Circuit Judges.

CARNES, Circuit Judge:

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

The facts of Patrick Lett's life that gave rise to this case read somewhat like a morality play. He was born and raised in Monroe County, Alabama. He had what he described as a nice childhood. Married and divorced, he has three daughters. He served his country in the National Guard and then the regular army. Some of his service was in Iraq as part of Operation Iraqi Freedom, and all of it was honorable. He received numerous citations and medals for meritorious achievement. His superior officers used superlatives to describe him and his dedication to the missions he was assigned.

After fourteen years in the military, Lett returned to civilian life the week before Christmas in 2003. It was not a happy time for him. He had lost friends and had seen fellow soldiers killed in Iraq. He had also seen what he described as "some very, very strange things." While he was in Iraq, his fiancée died. When he returned home his father was dying. He had trouble supporting his children. He felt pressured. He was depressed. He began to drink heavily, which only helped fuel the downward trajectory of his life. Lett felt, in his words, like "the lowest person on the face of the earth."

Enter temptation in the form of his cousin, Michael. Michael was a big time cocaine distributor, or what passes for one in Monroe County. He bought powder cocaine wholesale in Montgomery for resale as cocaine and crack back home. For

2

distribution, Michael had something of a friends and family plan. Influenced perhaps by the cultural mores of a south Alabama county, he did not rely on strangers or mere acquaintances to sell his drugs for him. Instead, he used his personal friends and members of his family.

Michael eventually prevailed upon Patrick to be one of his street level sellers, operating out of trailers, vacant houses and yards. On seven occasions during a five-week period in the Spring of 2004, Patrick Lett sold cocaine and crack cocaine to Ceonia Stanton, and sometimes to another person in Stanton's presence, in quantities ranging from just over a gram to nearly fourteen and a half grams. It was typical drug dealer conduct. But Patrick Lett was atypical, because he was a drug dealer with a conscience. With his conscience came remorse and a search for redemption. He felt guilty about his actions. He realized, as he put it, that "it takes a cruel-hearted person to actually take advantage of someone who has a disease, and that disease is addiction," and he "decided to get on my knees and pray a little harder and ask God to pull me back together, . . . which [H]e did." Lett quit selling drugs and left Michael's operation to the devil's own devices.

Lett re-enlisted in the military in October 2004, and again he rendered exemplary service to his country. His superior officers attested that Lett, a sergeant, was an outstanding soldier, dedicated to the welfare of his men and to

3

accomplishing whatever mission he was given. He made his men's lives better and his superiors' jobs easier. His captain said that Lett "exemplified the Army values" of "loyalty, duty, respect, selfless service, honor, integrity, personal courage." He would be willing to entrust his life to Lett.

Having pulled himself out of the world of illegal drugs and gone back to serving his country, Lett may have thought that he had left his past behind him. As Faulkner reminded us, however, "The past is never dead. It is not even past." William Faulkner, Requiem for a Nun 92 (1951). It turns out that Ceonia Stanton, to whom Lett had sold the drugs, was an undercover law enforcement agent working as part of a task force aimed at shutting down Michael Lett's operation. In September 2005, a grand jury indicted Lett and fourteen others, including Michael, for various federal drug crimes stemming from their roles in the conspiracy. Lett pleaded guilty to seven counts of possession with intent to distribute, one for each of the sales to the undercover agent, all in violation of 21 U.S.C. § 841(a)(1).

## I.

The presentence investigation report noted that Lett admitted selling 60.42 grams of crack cocaine and 7.89 grams of powder cocaine, which put his base offense level at thirty two. It recommended, and the government did not object to,

that level being lowered: by two levels because he met the five criteria for a safety valve reduction; by another two levels because he accepted responsibility for his crime; and by one more level because he timely notified the government of his intention to plead guilty before it dedicated substantial resources to prosecuting him. Those reductions left an offense level of twenty seven.

With that adjusted offense level and no prior criminal record, Lett's advisory guideline range was seventy to eighty-seven months imprisonment. He faced a mandatory minimum prison sentence of sixty months on five of the counts under 21 U.S.C. § 841(b)(1)(B). About those statutory mandatory minimum sentences, and the resulting inapplicability of the U.S.S.G. § 5C1.2 safety valve provision, the PSR stated:

> Based on a total offense level of 27 and a criminal history category of I, the guideline range of imprisonment is 70 to 87 months. Counts 8, 9, 10, 11, and 12, each carry a mandatory minimum penalty of 60 months. Although it appears that the defendant is eligible for consideration under U.S.S.G. § 5C1.2, because the minimum of the guideline range is 70 months, which is greater than the statutory mandatory minimum 60 months, 5C1.2 consideration is a moot issue.

Neither the government nor Lett lodged any objection to the PSR, and with the consent of both parties the district court adopted it as written. Lett called three witnesses to testify for him at the sentence hearing: a sergeant, a first sergeant, and a captain, all of whose testimony we alluded to earlier in describing Lett's military

5

service. Two of the three implored the court to impose the least sentence the law allowed. Lett himself also took the stand. He admitted the drug crimes he had committed during the short period of time two years earlier, accepted responsibility for them, described the "pride and respect and unity and honor" he feels when he puts on the uniform in service of his country, and asked the court to give him a sentence that would allow him to stay in the military so that he could continue supporting his three daughters, the oldest of whom was sixteen and pregnant.

At the end of the testimony, Lett's counsel asked the district court to put him on supervised release "or some kind of probation" or to give him "the minimum sentence possible" so that he could stay in the military. According to counsel, the Army was willing to allow Lett to continue his service if the district court sentenced him to probation. Even though he made the request, counsel acknowledged that "there's a minimum mandatory five-year sentence under the statute, and it would be very hard for the Court to find a five-year sentence that's constitutionality excessive," so he asked the court to give the lightest sentence possible.

The district court judge was well suited to evaluate Lett's military service, having himself served for six years as an officer and pilot in the United States Marine Corps and another fourteen years in the Army National Guard as a pilot

6

and the commanding officer of an assault helicopter company. He was sympathetic to Lett and impressed with how different this case was from others he had seen. Lett's complete lack of any prior criminal record and the substantial contributions he had made to the military in service of his country made him stand out. The judge reviewed Lett's service fitness ratings, which ranged from good to excellent and among the best in regard to promotion potential. He summarized the letters he had received and the testimony he had heard as proving that Lett was "an extremely valuable asset to the United States Army, an outstanding NCO, a model soldier, a role model with excellent work ethic, a dynamic, innovative leader, a shining example for his peers and subordinates."

The district court construed the arguments of Lett's counsel as a motion to enter a non-guideline sentence and to determine that the statutory mandatory minimum was constitutionally excessive so that he could sentence below it. The court did not find the mandatory minimum sixty-month sentences constitutionality excessive, but it decided not to sentence any higher than that. The court concluded that Lett's exemplary military service and his lack of any criminal history, other than during those five weeks he had sold drugs for his cousin, justified a variance under 18 U.S.C. § 3553(a) from the seventy to eighty-seven months range.

However, the court also decided that the statutory five-year mandatory minimum provided a floor beyond which it could not go:

> There is no way that I can legally go below that five-year mandatory minimum, even if I wanted to. So, discretion is limited by Congress, who has dictated that people who commit these kind of crimes shall serve no less than 60 months, or five years.

The court ordered that the sixty-month sentence on each of the seven counts be served concurrently.

## II.

Enter Matthew Sinor, a close friend of Lett's who had served with him in the Army for three years and a second-year student at Moritz College of Law at the time of sentencing. Sinor traveled from Columbus, Ohio to Mobile, Alabama for the proceeding, and when he returned to law school described what had happened to his criminal sentencing professor, Douglas A. Berman. Professor Berman suggested a theory to Sinor which he in turn conveyed to the district court in a letter dated April 17, 2006, four days after the court had sentenced Lett to sixty-months imprisonment.

In his letter Sinor informed the court of the professor's view that the safety valve provisions in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 operated to free the court of the mandatory minimum otherwise required by 21 U.S.C. § 841(b)(1)(B). Sinor told the court he was concerned that defense counsel had not raised the

8

argument, and that time for doing something about it under Fed. R. Crim. P. 35(a) was running out. Sinor sent copies of his letter to counsel for Lett and the government, but so far as the record shows neither filed a response.

The district court issued an order modifying Lett's sentence on April 24, 2006, which was the last day of the seven-day period for correcting sentences under Rule 35(a), as extended by the counting provision in Fed. R. Crim. P. 45(a)(2). The court explained that at the sentence hearing it had accepted the PSR's recommendation that the safety valve provision did not apply to Lett's sentence because neither Lett nor the government had objected to the PSR, and because the court believed that result was correct. Having reconsidered, the court now decided otherwise.

In setting out the reasons for changing its mind, the court explained in detail how it had interpreted the safety valve provision in § 5C1.2 before the decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005):

> It should be noted here that, in the pre-Booker world of sentencing, this Court has consistently denied other Defendants benefit of the safety valve where the guidelines range was calculated to be above the mandatory minimum. The basis for this result is the Court's belief that § 5C1.2 creates two subsets of Defendants; those whose guidelines sentences are above the mandatory minimum, and those Defendants whose guidelines sentences are below the mandatory minimum. It is this Court's interpretation of that provision that compelled it to conclude that only those Defendants whose guidelines sentences fell below the mandatory minimum were entitled

9

to application of that part of the safety valve which authorizes the Court to impose a sentence below the mandatory minimum. Otherwise, § 5C1.2 makes no sense.

In other words, how could the Court impose a sentence "in accordance with the applicable guidelines without regard to any statutory minimum sentence" if the applicable guidelines range is above the mandatory minimum? Any sentence imposed below the mandatory minimum in such a case necessarily would be outside the applicable guidelines, leaving the Court with no guidelines at all.

Moreover, had Congress and the Sentencing Commission intended that <u>any</u> safety valve-eligible Defendant, regardless of that Defendant's projected guidelines range, be qualified for a lower than mandatory sentence, they could have said so. But Congress and the Sentencing Commission did not say so. In fact, a reasonable interpretation of the [safety valve provision] compels a conclusion that the language "in accordance with the applicable guidelines" imposes an additional criterion that a Defendant must meet in order to qualify for a sentence below the mandatory minimum. That is, the Defendant must have a projected guidelines sentence below that minimum.

(emphasis in original; paragraph breaks added).

The court then asked itself: "Now, what does all of this mean in the post-<u>Booker</u> world," and answered its own question with the candid admission that: "The answer certainly is not clear, because there is little or no guidance from the courts of appeal or even from sister courts throughout the country." It found the decisions in <u>United States v. Cherry</u>, 366 F. Supp. 2d 372 (E.D. Va. 2005), and <u>United States v. Duran</u>, 383 F. Supp. 2d 1345 (D. Utah 2005), of little help because they "involved guideline ranges below the mandatory minimum."

10

Nonetheless, the district court concluded, without further explanation, that in the post-Booker world, "when all five conditions of § 5C1.2 are satisfied, the Defendant is safety valve eligible and the Court's sentencing discretion is not bounded by a statutory mandatory minimum sentence, irrespective of whether the accurately calculated advisory guidelines sentencing range is above or below that mandatory minimum."

With its discretion now unfettered by the five-year mandatory minimum of 21 U.S.C. § 841(b)(1)(B), the district court reapplied the § 3553(a) factors in light of Lett's limited role in the offense, his voluntary withdrawal from the criminal enterprise followed by his re-enlistment in the Army where he remained on active duty until his arrest, his lack of criminal history, and his unblemished and significant seventeen-year career in the military, including two tours of duty in Iraq. In light of those factors, the court concluded that it should vary downward so that the sentence imposed would be time served, which amounted to eleven days. The court imposed that sentence on all seven counts to run concurrently. As a result, Lett was released from prison subject to a term of supervisory release.

## III.

The government appeals the district court's judgment giving Lett a sentence of only eleven days for seven different drug sales over a period of five weeks,

11

totaling just over 60 grams of crack cocaine and just under 8 grams of powder cocaine. The government's contention is that the district court erred in using its Rule 35(a) authority to correct Lett's original five-year sentence, because its initial conclusion that Lett was not safety valve eligible was not an "arithmetical, technical, or other clear error" as required for use of the rule. As a fallback argument, which we need not reach, the government contends that even if the court were permitted to revisit its sentence under Rule 35(a), the resulting eleven day sentence was unreasonable.

Rule 35(a)'s single sentence provides: "Within 7 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(a). The district court did not claim, and Lett does not argue, that the court made an arithmetical or technical error in imposing the original sentence of sixty months. Instead, the issue is whether the district court's initial decision that the safety valve guideline did not apply to remove the mandatory minimum provision in Lett's case was a "clear error."

The Criminal Rules Advisory Committee explained that what it meant by "clear error" was "acknowledged and obvious errors in sentencing." Fed. R. Crim. P. 35 advisory committee's notes (1991). The committee went on to add:

> The authority to correct a sentence under this subdivision is intended to be very narrow and to extend only to those cases in which

12

an obvious error or mistake has occurred in the sentence, that is, errors which would almost certainly result in a remand of the case to the trial court for further action . . . .  The subdivision is not intended to afford the court the opportunity to reconsider the application or interpretation of the sentencing guidelines or for the court simply to change its mind about the appropriateness of the sentence. . . .

> . . . .

Rule 35(c) provides an efficient and prompt method for correcting obvious technical errors that are called to the court's attention immediately after sentencing.

Id.[1]

We quoted that language in United States v. Yost, 185 F.3d 1178 (11th Cir. 1999), and summarized it as meaning that "the district court may not simply change its mind, and any error to be corrected under that subsection must be obvious."  Id. at 1181.  We agreed with the district court in Yost that sentencing a defendant under what was obviously the wrong offense level guideline—one applicable to an offense for which the defendant had not been convicted—was clear error within the corrective reach of the rule.  Id. at 1179–81.

The Criminal Rules Advisory Committee notes accompanying Rule 35(a) cite two decisions as examples of the kind of error that is clear enough for correction under it.  Fed. R. Crim. P. 35 advisory committee's notes (1991).  One is United States v. Rico, 902 F.2d 1065 (2d Cir. 1990), where an erroneous statement

---

[1]  The provision now located in Rule 35(a) was in Rule 35(c) until it was moved as part of the 2002 amendments to the rule.  Id. advisory committee's notes (2002).

by the prosecutor and a typographical error in the presentence report had caused the court to impose a sentence different from the one the parties had agreed to in a court-accepted plea agreement. Id. at 1066. The court and both parties acknowledged at re-sentencing that the initial sentence was a mistake. See id. The Second Circuit concluded on appeal that the district court had "properly corrected its illegal sentence." Id. at 1068.

The second example the advisory notes give of a proper application of the clear error standard of Rule 35(a) is United States v. Cook, 890 F.2d 672 (4th Cir. 1989). There, the district court initially sentenced the defendant to three months of community confinement followed by three months of supervised release, a sentence contrary to the guidelines and unlawful because supervised release is permitted only after a term of imprisonment. Id. at 674. The Fourth Circuit affirmed the correction of that sentence to a term of three months in prison followed by three months of supervised release. Id. at 674–75. In affirming, the court recognized that the authority of a district court to correct a sentence is narrowly confined, but characterized the case before it as an "unusual" one where the original sentence was "an acknowledged and obvious mistake" and unlawful. Id. at 675.

14

The <u>Yost</u>, <u>Rico</u> and <u>Cook</u> decisions trace out the boundaries of a narrow corrective power limited in scope to those obvious errors that result in an illegal sentence or that are sufficiently clear that they would, as the committee notes specify, "almost certainly result in a remand of the case to the trial court for further action." Fed. R. Crim. P. 35 advisory committee's notes (1991). In this case the district court did not sentence Lett under the wrong guideline, as in <u>Yost</u>; it did not impose a sentence different from the one in the plea agreement, as in <u>Rico</u>; and it did not impose a sentence that was illegal under the applicable guidelines and statutory provisions, as in <u>Cook</u>.

At most, the district court misunderstood the breadth of its discretion under the safety valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, read in light of the <u>Booker</u> decision, causing the court to impose a sentence higher than it would have had it correctly gauged the law. Even so, the sentence the court did impose was plainly permissible under the guidelines and applicable statutes. We say "at most," because it is not clear that the district court's initial understanding of the scope of its discretion was mistaken. It is not obvious that the <u>Booker</u> decision eviscerated mandatory minimum sentences in every case where the defendant meets the five criteria for safety valve treatment, including those in which the

15

advisory guideline range is above the mandatory minimum. That result would be the effect of adopting the theory on which the re-sentencing in this case is based.

When the Supreme Court did its remedial work on the sentencing scheme to save the guidelines from constitutional doom, Booker, 543 U.S. at 244–68, 125 S. Ct. at 756–69, it did not address this mandatory minimum, safety valve issue. The issue may be viewed as one of intent, and not just the congressional intent behind 21 U.S.C. § 841(b)(1)(B) and 18 U.S.C. § 3553(f), or the Sentencing Commission's intent behind § 5C1.2 of the guidelines, but also the intent behind the Supreme Court's reconstructive interpretation of the sentencing statutes in the remedial part of the Booker decision. It seems to us that the best approach to the merits of the post-Booker mandatory minimum issue would be to read the statutory and guidelines provisions and the Booker Court's restructuring work together and attempt to ascertain their meaning as though they were all statutory enactments.

We do not have occasion to do that in this case because the merits of the issue are not before us. Instead the issue before us is whether, at the time the district court entered its Rule 35(a) order, it was clear that the court had erred in its earlier conclusion that a sentence below the mandatory minimum was not permissible in the circumstances of this case. We are confident that conclusion was not clear error. Reasonable arguments can be made on both sides of the post-

16

Booker mandatory minimum issue, and we have no doubt that they will be. But arguable error is one thing, and clear error is another. Regardless of how this issue is ultimately determined on the merits, the sentence the district court initially imposed was not illegal, and any error was not of an acknowledged and obvious type, the kind that would "almost certainly result in a remand of the case to the trial court for further action." Fed. R. Crim. P. 35 advisory committee's notes (1991).

Indeed, the district court itself conceded that the answer to the post-Booker mandatory minimum question "certainly is not clear," and that there are few if any decisions from other courts that are useful in answering it. We agree with the district court that United States v. Cherry, 366 F. Supp. 2d 372 (E.D. Va. 2005), and United States v. Duran, 383 F. Supp. 2d 1345 (D. Utah 2005), are distinguishable because they involved guideline ranges below the minimum mandatory sentence.

We are not persuaded, as Lett argues, that either United States v. Lopez, 264 F.3d 527 (5th Cir. 2001), or United States v. Poyato, 454 F.3d 1295 (11th Cir. 2006), shows that an obvious error or mistake occurred when he was originally sentenced. Because Lopez is not binding in this circuit, it would be unlikely to serve as a basis for concluding that any other result would be obvious error and would almost certainly result in vacating the sentence. The Lopez case is also

17

distinguishable, because the applicable guidelines range there ended up being below the mandatory minimum level at the time the safety valve was to be applied. Lopez, 264 F.3d at 530. The Lopez decision did not address whether safety valve relief from a mandatory minimum sentence is available when the guidelines range is above that minimum sentence level.

Nor does our own Poyato decision resolve the matter. It contains wholly unremarkable statements about the post-Booker guidelines being advisory, and about proper sentencing involving applying the guidelines, considering the § 3553(a) factors, and setting a reasonable sentence below the statutory maximum. 454 F.3d at 1299. The actual holding in Poyato was that safety valve relief was properly denied because the defendant failed to meet one of the five prerequisites for it (he had possessed a firearm during the commission of the crime). Id. at 1298–99. Not only that but as in Lopez, the Poyato defendant's advisory guideline range was below the statutory minimum. See id. at 1296. Therefore, Poyato did not present the issue of whether the safety valve can have any application where the guidelines range is above the statutory minimum. See United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) (per curiam) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced the decision." (quotation marks and citation

18

omitted)). For that reason any statements touching on this issue would be no more than dicta anyway. See Aron v. United States, 291 F.3d 708, 716 (11th Cir. 2002) (Carnes, J., concurring) ("All that is said which is not necessary to the decision of an appeal given the facts and circumstances of the case is dicta.").

At oral argument, Lett's present counsel (who did not represent him in the district court) invited us to import into the Rule 35(a) "clear error" measure the plain error standard of Rule 52(b), as interpreted and applied in countless decisions. The invitation is logically appealing because the narrow purpose of Rule 35(a) dovetails nicely with the scope of the plain error rule. Before an error is subject to correction under the plain error rule, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule; it must have adversely affected the outcome of the proceedings; and it must be such that the failure to correct it would seriously affect the fairness, integrity or public reputation of judicial proceedings. United States v. Olano, 507 U.S. 725, 732–37, 113 S. Ct. 1770, 1776–79 (1993); United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). If an error meets all those requirements, it is also the kind of obvious error that "would almost certainly result in a remand of the case to the trial court for further action" and would therefore come within the narrow scope of Rule 35(a). Fed. R. Crim. P. advisory committee's notes (1991). As a margin note here,

19

we point out that the Supreme Court has described the plain error rule with language that sounds like the Rule 35(a) "clear error" standard. In the Olano opinion, for example, the Court said that the "plain" in plain error "is synonymous with 'clear' or, equivalently, 'obvious.'" 507 U.S. at 734, 113 S. Ct. at 1777.

All this may be well and good, but it does not help Lett. For the same reasons that the district court's view of the mandatory minimum requirements in light of the safety valve provisions is not an obvious error or mistake that almost certainly would have caused the sentence to be overturned on appeal, it is not plain error. See United States v. Castro, 455 F.3d 1249, 1253 (11th Cir. 2006); United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003); United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999).

**IV.**

We agree with the district court's recognition that the proper resolution of the mandatory minimum and safety valve issue that prompted its Rule 35(a) modification of Lett's sentence is not clear. There is no decision on point from any court, and reasonable people could differ about the matter. That means the court's initial understanding was not "an obvious error or mistake . . . which would almost certainly result in a remand" if not corrected, which is the proper standard of clarity under the rule. Fed. R. Crim. P. 35(a) advisory committee's notes

20

(1991). The district court used Rule 35(a) to take another stab at interpreting the applicable statutory and guideline provisions in light of the <u>Booker</u> decision, and the committee notes forbid use of the rule for that purpose. <u>Id.</u> (The rule "is not intended to afford the court the opportunity to reconsider the application or interpretation of the sentencing guidelines.").

We do not question the district court's good faith in attempting to work its way through the problem, and we are not unsympathetic to its desire to give Lett a sentence less than the mandatory minimum. Our review, however, is <u>de novo</u>, and our reading of Rule 35(a) requires that we vacate the court's order re-sentencing Lett and remand the case with instructions that it impose the original sentence of sixty months to run concurrently on each count.

JUDGMENT VACATED AND REMANDED WITH INSTRUCTIONS.