[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11800
Non-Argument Calendar

_____

D.C. Docket No. 4:13-cr-10028-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEDIAN ACOSTA-GONZALEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 2, 2015)

Before WILSON, JULIE CARNES, and BLACK, Circuit Judges.

PER CURIAM:

Defendant Ledian Acosta-Gonzalez ("Defendant" or "Acosta-Gonzalez") appeals his sixty-month sentence, imposed following his conviction for conspiracy to encourage and induce aliens to unlawfully enter the United States and for failing to heave to[1] law enforcement officers. Defendant argues that the district court erred by applying a ten-level enhancement to his base offense level as a result of the discharge of their firearms by law-enforcement officers in the course of halting Defendant's vessel. Upon review of the record and consideration of the parties' briefs, we affirm.

## I.    BACKGROUND

In the very early morning of September 11, 2013, the Monroe County Sheriff's Office received a report that a twenty-six-foot boat, the "Robalo," had been stolen. Soon thereafter, members of the Army National Guard spotted defendant Acosta-Gonzalez and co-defendant Dioselis Fuentes-Nordase loading the Robalo with food, water, and twenty-seven drums of fuel near Boot Harbor Key in Marathon, Florida.

At approximately 1:43 am, three Customs and Border Patrol ("Customs") agents and one Monroe County Sherriff's detective (collectively, the "agents"), who were on patrol in the waters off Sombrero Beach, spotted a vessel departing Boot Harbor Key. Once it exited the harbor, the agents observed the vessel

---

[1] According to 18 U.S.C. § 2237(e) (2010), the term "heave to" means to cause a vessel to slow, come to a stop, or adjust its course and speed to facilitate a law enforcement boarding.

increase its speed, turn south, and shut off its navigation lights.  The agents pursued the vessel, which they identified as the Robalo, and at approximately three miles from land, shone a spotlight on it and activated a blue light and siren, indicating to the vessel that it should stop and prepare for boarding.

The Robalo did not stop, though, but rather quickly sped away.  The agents gave chase, with speeds reaching forty-five knots.  Defendant Acosta-Gonzalez, whom agents later identified as the person piloting the boat, began taking evasive maneuvers, making radical changes in course with sharp turns toward land.  The agents fired two "flash-bang" rounds from a shotgun directly into Acosta-Gonzalez's line of vision, but these did not deter his flight.  The agents then attempted to maneuver their vessel parallel to the Robalo to disable its engine through gunfire, but Acosta-Gonzalez drove the boat so violently and erratically-- throwing wake and spray into the Customs vessel--that the agents had to retreat and move fifty feet behind him.

As the agents again pulled parallel to the Robalo in another attempt to disable its engines, Acosta-Gonzalez steered the vessel hard left, directly towards the Customs boat.  Only the evasive actions of the Customs pilot avoided a serious collision.  Nevertheless, a collision could not be totally avoided and, traveling at forty knots speed, the Robalo struck a glancing blow to the Customs vessel, inflicting injuries to both boat and crew.  Not deterred by this collision, Defendant

3

continued his flight for "quite some time" and was approaching land, until the agents were finally able to position their vessel parallel to the Robalo and fire three shots into its engine, disabling it and halting the chase.

The agents took Acosta-Gonzalez to the Monroe County Sheriff's office, where he informed them that, when intercepted, he was headed to Cuba to pick up relatives of a man named "Chapiro" and two of his own family members, and illegally transport them back to the United States. Acosta-Gonzalez further informed the agents that Chapiro supplied him with the Robalo, a GPS unit, and a satellite phone.

A grand jury returned a three-count indictment against Acosta-Gonzalez.[2] Following trial, a jury found him guilty on two counts: conspiracy to encourage and induce aliens to unlawfully enter the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv)-(v)(I), and failure to heave to law enforcement officers, in violation of 18 U.S.C. § 2237(a)(1)-(2). At sentencing, the district court determined that Acosta-Gonzalez's Sentencing Guidelines range was fifty-one to sixty-three months[3] and sentenced him to two concurrent sixty-month terms,

---

[2] Acosta-Gonzalez's co-defendant, Fuentes-Nordase, pled guilty to one count of conspiracy to encourage and induce aliens to unlawfully enter the United States.

[3] In calculating the Guidelines range, the district court began with a base offense level of 12, pursuant to § 2L1.1(a)(3), which applies to offenses involving smuggling, transporting, or harboring any unlawful alien. Because a firearm was discharged in the course of the crime, the court then added ten levels pursuant to § 2L1.1(b)(4)(A), to arrive at an offense level of 22. Finally, the court added two more levels because the offense involved intentionally or recklessly

4

followed by three years of supervised release.  Acosta-Gonzalez has appealed this

sentence, and argues that the district court should not have applied U.S.S.G. §

2L1.1(b)(5)(A), which added ten offense levels, when computing his offense level

under the Sentencing Guidelines.

## II.    STANDARD OF REVIEW

We review the reasonableness of sentencing procedures under an abuse of

discretion standard.  *United States v. Ellisor*, 522 F.3d 1255, 1273 n.25 (11th Cir.

2008).  "A court that misinterprets or misapplies the Sentencing Guidelines

inherently abuses its discretion.  Therefore, we review the district court's factual

findings for clear error, and its interpretation of the Guidelines de novo."  *United

States v. McQueen*, 670 F.3d 1168, 1169 (11th Cir. 2012) (citing *United States v.

Doe*, 661 F.3d 550, 565 (11th Cir. 2011); *Ellisor*, 522 F.3d at 1273 n.25; and

*United States v. Campbell*, 491 F.3d 1306, 1315 (11th Cir. 2007)).

However, we review sentencing arguments raised for the first time on appeal

for plain error.  *United States v. Bonilla*, 579 F.3d 1233, 1238 (11th Cir. 2009).

Under plain error review,

> [a]n appellate court may not correct an error the defendant failed to
> raise in the district court unless there is: (1) error, (2) that is plain, and
> (3) that affects substantial rights.  If all three conditions are met, an

---

creating a substantial risk of death or serious bodily injury to another person, resulting in a total
offense level of 24.  U.S.S.G. § 2L1.1(b)(6).  Because Acosta-Gonzales had no criminal history
points and a criminal history category of I, the above calculation yielded a sentence of fifty-one
to sixty-three months.  U.S.S.G. § 5A.

appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (quoting *United States v. Cotton*, 535 U.S. 625, 631-32 (2002)) (internal citation and quotation marks omitted).  "'Before an error is subject to correction under the plain error rule, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule[.]'"  *United States v. Schmitz*, 634 F.3d 1247, 1270-71 (11th Cir. 2011) (quoting *United States v. Lett*, 483 F.3d 782, 790 (11th Cir. 2007)).

## III.   ANALYSIS

Defendant Acosta-Gonzalez argues that the district court erred in its Guidelines calculation when it applied U.S.S.G. § 2L1.1(b)(5)(A), which resulted in a ten-level enhancement.  Subsection (b)(5)(A) provides that, "[i]f a firearm was discharged, [the sentencing court is to] increase [the offense level] by **6** levels, but if the resulting offense level is less than level **22**, increase to level **22**."  U.S.S.G. § 2L1.1(b)(5)(A) (emphasis in original).  The district court applied this enhancement because a firearm was discharged in the course of defendant Acosta-Gonzalez's efforts to smuggle unlawful aliens.  Specifically, in response to the defendants' reckless and dangerous efforts to escape, Customs agents were forced to fire three shots into the engine of the defendants' vessel to bring the chase to a halt.

6

Defendant Acosta-Gonzalez nonetheless contests the application of this enhancement, asserting two grounds for his objections: one preserved and one raised for the first time on appeal. As to the preserved objection, Defendant argued below that because he had not induced the agents to discharge their firearms, the enhancement for discharge of a firearm was not warranted. As set out above, we review this preserved error under a clear error standard as to factual findings, but review de novo the district court's interpretation of the Guidelines. As to the defendant's unpreserved error, he raises for the first time on appeal an argument that, where there are two or more co-defendants, this enhancement cannot be applied when a law enforcement officer is the person who has discharged a firearm. On this newly-raised argument, a plain error standard of review applies, as explained above.

A.     Defendant's Preserved Error: The "Inducement" Argument.

Section 2L1.1(b)(5)(A) calls for an enhancement if a firearm has been discharged during the course of an alien-smuggling offense, but only if the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused this conduct." Here, the district court concluded that the defendant induced the Customs agents to fire their weapons. Defendant argues, however, that when a non-participant in the criminal activity has fired the weapon, the firearm-discharge enhancement can be applied only when this non-participant

was acting in self-defense.  According to the defendant, if the non-participant (here, the agents) fired the weapon only for the purpose of ending the criminal activity (here, stopping Defendant's dangerous efforts to escape), then the enhancement should not apply.

Defendant's argument is contradicted by controlling authority in this Circuit: *United States v. McQueen*, 670 F.3d 1168.  *McQueen* is not only controlling here, it is directly on point, and Defendant has failed to distinguish it.  In *McQueen*, Customs officers sighted a boat off the coast of Florida that they suspected of smuggling aliens or narcotics.  The officers activated their lights and sirens, and commanded the boat to stop.  Defendant McQueen, the operator of the boat, did not do so, but instead tried to head back toward the ocean.  During this several-minute chase, the officers fired illuminated warning shots, followed by pepper balls into the cabin of the boat, and finally two more warning shots.  When the defendant still continued his flight, the officers had to board the boat while it was still moving, and they discovered fourteen illegal aliens on board.  *Id.* at 1169.

On appeal, defendant McQueen argued that, in firing these warning shots, the officers had acted hastily, recklessly, and unnecessarily and that McQueen should not be deemed to have induced their conduct.  Further, he argued that it would not have been reasonably foreseeable to him that law enforcement authorities would fire on him under these circumstances.  *Id.* at 1170-71.  On

appeal, we rejected McQueen's argument.  In doing so, we relied on the definition of "induced" articulated in *United States v. Williams*, 51 F.3d 1004, 1011 (11th Cir. 1995), *abrogated on other grounds by Jones v. United States*, 526 U.S. 227 (1999), which was a carjacking case in which it was the victim-occupant of the vehicle who had fired the shot.  We reiterated that, per *Williams,* a defendant has induced the acts of another that were brought about, produced, or caused by the defendant's conduct.  Applying that definition, we rejected McQueen's argument that he could not be deemed to have caused the agents to fire their weapons because that response was reckless and not foreseeable.  We noted that the agents' firing of their guns was a measured response to McQueen's continuing efforts to flee, that McQueen had brought about this response, and that it certainly should have been foreseeable to him.  *McQueen,* 670 F.3d at 1171.  Contrary to Defendant's argument here, *McQueen* did not require that the third-party whom the defendant had induced to fire the gun be acting in self-defense.  To the contrary, we held that the agents' firing of their guns to stop McQueen's flight by boat was sufficient to justify application of the enhancement.

Likewise, here, defendant Acosta-Gonzalez engaged the officers in an even wilder chase, as he made an extended high speed get-away attempt, on the open sea, in the dead of night.  One officer described it as the "most violent chase and experience" that he had endured in a thirteen-year career.  Further, defendant

9

Acosta-Gonzalez admitted that he fled from the agents to "get out of the problem," and that he wanted to make land to "run away." And even though Defendant now claims that he did not intend to hit the Customs vessel, a collision between the boats did occur, with resulting damage. Certainly, Defendant's actions in fleeing from the agents brought about, produced, and caused the agents to discharge two "flash-bang" rounds across Acosta-Gonzalez's line of vision, and then three disabling rounds into the Robalo's engine.

In short, the district court properly rejected the defendant's argument that the enhancement could be applied for a third-party's discharge of a firearm only when the third-party was acting in self-defense. For that reason, we conclude that, as to this preserved allegation of error, the district did not err when it applied the § 2L1.1(b)(5)(A) enhancement.

B.    Unpreserved Error: Defendant's Argument That The Enhancement Cannot Apply Because There Were Multiple Criminal Participants.

Defendant raises a second ground in support of his argument that the district court erred in imposing the firearms-discharge enhancement.  As this ground was not raised before the district court, Defendant may succeed only if he demonstrates that consideration of this new ground reveals an error below that was plain and that affected the defendant's substantial rights.  We conclude that there was no error, plain or otherwise, in the district court's failure to intuit this new argument now raised by Defendant.

Defendant's argument is a novel one.  He contends that, even if a law enforcement officer's discharge of his weapon can satisfy the requirement that the defendant induced the firing of the weapon, this principle can apply only when the defendant is the sole criminal participant.  If the defendant is acting together with other criminally-culpable individuals, then the enhancement cannot apply. Defendant reaches this seemingly odd conclusion through a dissection of a portion of the relevant conduct section of the Guidelines that sets out the circumstances under which a defendant can be held responsible for specific offense characteristics.  He points out that "in the case of a jointly undertaken criminal activity," the defendant is responsible only "for all reasonably foreseeable acts and omissions of others in furtherance of the jointly-undertaken activity.  U.S.S.G. §1B1.3(a)(1)(B).  From this language, Defendant infers that, in applying the

11

specific enhancement here, one can look only to the conduct of the criminal participants in the jointly-undertaken activity. And because neither he nor his cohorts fired a weapon, Defendant concludes that the enhancement cannot apply.

This construction seems counter-intuitive, and indeed a full reading of the entire section and related commentary reveals it to be erroneous. That is, the defendant has omitted another subsection of the same relevant conduct provision, which provides that a defendant can also be held responsible for specific offense characteristics when he either "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused" the prescribed acts or omissions. U.S.S.G. § 1B1.3(a)(1)(A). And as discussed above, the defendant clearly induced the firing of the weapon by the agents. Further, this subsection does not require that it be a fellow-criminal participant who was induced to shoot. Nor, under this subsection, does the act induced need to be in furtherance of the criminal activity.

Indeed, the commentary to § 1B1.3 makes it abundantly clear that a defendant may be sentenced under *either* subsection (a)(1)(A) *or* subsection (a)(1)(B), *or even* "more than one subsection," when engaged in jointly undertaken criminal activity. *See id.* at § 1B1.3 cmt. n.2(a)(1)-(b)(1). Finally, if a defendant is found to be accountable under one provision, "it is not necessary to review alternative provisions under which such accountability might be established." U.S.S.G. § 1B1.3 cmt. n.2(a)(1). Additionally, the section commentary explicitly

12

states that "[t]he requirement of reasonable foreseeability applies only in respect to the conduct . . . of others under subsection (a)(1)(B).  It does not apply to conduct that the defendant personally undertakes [or] . . . induces[;] such conduct is addressed under subsection (a)(1)(A)."  *Id.* at § 1B1.3 cmt. n.2.  Thus, under the unequivocally clear language of the Sentencing Guidelines and their commentary, § 1B1.3(a)(1)(B) does not limit § 1B1.3(a)(1)(A) in the manner that defendant advocates.

In short, the district court did not err, plainly or otherwise, by applying the § 2L1.1(b)(5)(A) enhancement, notwithstanding the fact that it was a customs agent, and not the defendant or one of his criminal cohorts, who discharged the firearms in this case.  *Schmitz*, 634 F.3d at 1270-71.  For all of the above reasons, the judgment is affirmed.

**AFFIRMED.**

13