[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 7, 2008
THOMAS K. KAHN
CLERK

_____

No. 05-14459

_____

D.C. Docket No. 04-20064-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID LEE ELLISOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 7, 2008)**

Before TJOFLAT, FAY and SILER,[*] Circuit Judges.

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

David Lee Ellisor was convicted by a jury on eight counts of mail fraud for selling tickets to thousands of schoolchildren and their parents who expected to attend a "Christmas From Around the World" extravaganza. The district court sentenced Ellisor to 87 months' imprisonment and ordered restitution of $38,509.09. In this appeal, Ellisor contests the factual support for his convictions, several evidentiary rulings, and various aspects of his sentencing. We affirm the district court's judgment in all respects.

Part I of this opinion sets forth the factual and procedural background. In part II, we determine that the district court did not abuse its discretion in making certain evidentiary rulings and find that there was sufficient evidence for a reasonable jury to convict Ellisor on all counts. Part III disposes of Ellisor's claims of sentencing error. Part IV concludes.

I.

A.

In August 2003, David Lee Ellisor approached Michael Schott, the owner of Party Caterers, to offer his company the sole concession rights to a show called "Christmas From Around the World" (the "Christmas show") in exchange for an up-front payment of $1,400. According to Ellisor, the show was sponsored by the

2

University of Miami art department and would feature Christmas gifts and display pieces brought by attending diplomats. Party Caterer's concession rights would include the right to serve alcohol and formal dinners to the diplomats, and $5 lunches to students who visited the show. Schott accepted the business proposal in the belief that the opportunity would be a lucrative one, particularly since Ellisor promised him twenty percent of the show's total revenues "to insure [he would] not lose a thing." Notwithstanding his receipt of the up-front payment, Ellisor made follow-up visits to Party Caterers over the ensuing months to ask for more money. Ultimately, Ellisor received a total of $7,842 from Party Caterers in the form of cash, checks, and charges to its Office Depot corporate account for sundry expenses that Ellisor claimed were related to the show, including the payment of Ellisor's rental car bill and expenses incurred in assembling and mailing out invitations for the show.

In September 2003, Ellisor began mailing the invitation materials to teachers at public and private schools in Miami-Dade County, urging them to take their students on "an amazing field trip" to see the Christmas show. The invitation materials indicated that the show was sponsored by the University of Miami art department and included an April 10, 2003 letter from Walt Hines, a part-time lecturer in the University of Miami art department, purportedly confirming the

3

university's sponsorship of the show. Hines's mailbox at the university was listed as the return mailing address. The materials also claimed that the show was presented by the International Diplomatic Corps of Washington, D.C. (of which Ellisor was identified as an Ambassador-at-Large and diplomatic liaison), as part of the International Ambassadors Foreign Embassy Tour. The cost of the show was $10 per student, made payable to the University Diplomatic Trust Account,[1] and the dates of the show were listed as December 3, 4, and 5, 2003, from 9:00 a.m. to 3:00 p.m.

Excited about the opportunity for their students to attend what the invitation materials described as a "once in a lifetime opportunity" to meet 28 foreign ambassadors, view Christmas trees decorated with ornaments from other countries and cultural art exhibits, and receive thousands of dollars' worth of sponsored gifts, teachers from approximately 23 schools filled out registration forms reserving tickets for students ranging from the third to the fifth grade. Over the next couple of months, several teachers telephoned Ellisor to learn more about the details of the show. According to teachers who testified at trial, Ellisor made the

---

[1] Ellisor incorporated the University Diplomatic Trust Account as a for-profit corporation on September 17, 2003, and listed himself and his friend, Mark B. Weiser, as the officers. The corporation's listed business address was the home address of Angela Saiza Bailey, Ellisor's then-girlfriend. Ellisor also opened an account for the University Diplomatic Trust Account at Bank of America on October 10, 2003. Ellisor and Weiser were the only signatories on the account.

show sound even more enticing, promising that there would be Christmas trees and decorations donated by the Christmas Palace (a local business selling Christmas merchandise), "[f]our hundred some lights and characters, like Harry Potter, going around mixing with the kids in the crowd," a hot Christmas lunch, an educational scavenger hunt, and even live reindeer.[2] Some of the parents also became interested in attending after learning that adults could participate in the raffle and win prizes. Having secured the necessary permission from the schools and the parents, the teachers collected $10 per ticket from the students and parents, consolidated the money into checks issued by the schools and made payable to the University Diplomatic Trust Account, and mailed the checks to Walt Hines's mailbox at the University of Miami. The schools also arranged and paid for separate bus transportation for the students.

The materials listed November 4, 2003, as the date on which payment was

[2] As captured by a recording made by the Federal Bureau of Investigation of a message that Ellisor left on one teacher's home answering machine, Ellisor promised that:

> The event will be decorated sort of Harry Potter-ish. Every child will have a seat. There will be the international exhibits with their trees, gifts underneath them. Each child will get ten tickets. They will fill them out at school. They will bring them and put them in the big tumbler we have. We will be giving away presents the entire time the children are there. There's a question now with the Homeland Security whether the children will be allowed to bring in their lunch. They may have to leave it on the bus or they are going to bring in a caterer and allow you to have the option of eating inside with the caterer or the concession stands. . . . There is also a continuous music carol concert going on. It will be lovely.

due.[3]  On November 6, Ellisor checked into a suite at the Doubletree Hotel, where he stayed for the next two weeks.  That same day, he requested that Enterprise Rent-a-Car deliver a luxury automobile – first a Jaguar, and then a Cadillac De Ville – to the Doubletree Hotel, and rented the car for a week.

Some time after sending in their payments, the teachers received packages containing raffle tickets to be distributed to the students.  The packages also contained materials advertising $20 tickets to attend two evening shows of "Christmas From Around the World," from 4:00 to 8:30 p.m. and from 8:30 to 10:30 p.m.  A glossy flier identified the Christmas Palace as the presenter of the evening shows, and gave special thanks to the University of Miami art department, the City of Miami Police Department, the City of Miami Fire Department, and the Doubletree Hotel Coconut Grove.  A number of Christmas Palace brochures were also enclosed.

Meanwhile, Ellisor met with the convention center manager at the Coconut Grove Expo Center, Gregory Wright.  Ellisor told Wright that the University of Miami had hired him to put on the Christmas show because "he was a great promoter."  He requested the convention center from December 1 through 5, 2003,

---

[3] While some schools were able to send in payment before the deadline, others were not. Ellisor assured the latter that they could still send in their money.

including set-up and break-down days. Wright gave Ellisor a rental application to complete and explained the requirements to hold a show at the convention center: payment of a use fee (including an initial deposit and a larger, final payment), an assembly permit and floor plan approval from the fire department, an occupational license from the City of Miami financial department, a certificate of insurance, and police security. He emphasized that an actual certificate of insurance was necessary; an insurance binder would be inadequate.

On September 15, Ellisor submitted a rental application, together with a $2,500 deposit check provided by the Miami Motorcycle Show. Ellisor then submitted a proposed contract on November 10, three days after the November 7 deadline; nonetheless, Wright did not enforce the deadline. On November 13, Ellisor gave Wright a check for $5,000 toward the outstanding use fee, but that check bounced due to nonsufficient funds. Wright then informed Ellisor that he would no longer accept checks as payment; Ellisor reassured Wright that he had plenty of money coming in. On November 19, Ellisor gave Wright $1,050 in cash.

In the days leading up to the show, Ellisor continued to confirm that the show would proceed as planned. Ellisor asked one teacher to give the school's check for $1,060 directly to the convention center. On December 1, the teacher went to the convention center and attempted to give the check to Gregory Wright,

7

who refused to accept it. Ellisor then picked up the check in person from the school on December 2, assuring the students that the show would proceed as planned. He also told the students that they would receive extra raffle tickets if they would make ornaments from different countries and bring them to the convention center.[4] Also on December 2, Ellisor went to another elementary school to pick up a check for $2,260. Concerned by Ellisor's disheveled appearance, the school principal sought assurance that the show would live up to the students' expectations. Ellisor replied that it would. Later that day, Wright checked on the convention center and saw no set-up, no Christmas trees or decorations, no tables, chairs, sound system, or art. There were no communications from any ambassadors or any security personnel. Wright did receive a fax of an insurance binder, but that was inadequate to satisfy the rental contract's requirement of an insurance policy.

On December 3, 2003, the first day scheduled for the Christmas show, Ellisor wrote and cashed a check to himself for an amount that was effectively the remaining balance of the University Diplomatic Trust Account, writing "presents"

---

[4] These students were not the only people whom Ellisor asked to bring items to the show. Ellisor repeated this raffle-tickets-for-ornaments line to another group of students. He also told another teacher that chaperones could receive free admission if they brought "a free gift for a homeless child." Finally, Ellisor asked a music teacher to bring a group of her students to perform holiday songs at the show, and promised that a state-of-the-art sound system would be provided.

in the memorandum line.[5]  He then purchased a Jaguar 393.[6]  At about the same time, the students, teachers, and chaperones who had purchased tickets for the Christmas show were on their way by bus to the convention center.  They found it locked and empty.  Attempts to reach Ellisor by telephone were unsuccessful.  He left a greeting for the telephone number listed for the show that stated:

> This is David.  I'm sorry to inform you but the show has been postponed because we didn't have enough money to buy the presents. The City of Miami would not accept the school checks and we have been fighting and we are sorry about the last minute delay.  The field trip has been postponed until a couple weeks from now.  We are so sorry.  Please call Walter Hines.

In all, approximately 2,700 tickets were purchased for the Christmas show; no refund was ever given.  The Federal Bureau of Investigation obtained a criminal complaint and warrant for Ellisor's arrest on December 11, 2003.  On January 20, 2004, Ellisor surrendered to authorities.

## B.

On January 29, 2004, a grand jury in the Southern District of Florida

---

[5] Three of the schools were able to put stop-payment orders on their checks totaling $3,830, but Ellisor had already withdrawn the funds from the account.  Bank of America therefore reimbursed the schools for those checks and bore a loss of $3,914.49 (including fees).

[6] Ellisor had earlier responded to an advertisement for a Jaguar 393 and paid initial deposits, in cash, on November 17 and 19, 2003.  On test drives of the car, he asked the owner whether she was sure that the car could "make it to the Carolinas."  On December 3, Ellisor made a final cash payment and traded in Angela Saiza Bailey's car for the Jaguar.

returned an indictment charging Ellisor with eight counts of mail fraud in violation of 18 U.S.C. § 1341.[7]  The trial commenced on February 1, 2005.

A number of school teachers and personnel testified as to their receipt of the written materials promoting the Christmas show and their interactions with Ellisor, as described in part I.A, supra.  Five of the teachers also had conversations with Ellisor in which he indicated the existence of certain problems with the show, but at no time did he inform them that the show would not occur.  On the contrary, Ellisor assured them that the show was "absolutely" going to go on, "even if people had to work 'round the clock."

The Government called a special agent with the Diplomatic Security Service of the United States Department of State, who testified that there was no record of Ellisor being an Ambassador-at-Large or diplomatic liaison.  No group of ambassadors was scheduled to visit Miami in the fall of 2003 for a Christmas show, and no one in the Miami field office recollected ever having conversed with Ellisor about anything.

Furthermore, the Government introduced evidence that refuted Ellisor's specific claims about the show's sponsorship.  The owner of the Christmas Palace,

_____

[7] 18 U.S.C. § 1341 proscribes the use of the United States mails in furtherance of "any scheme or artifice to defraud, or [to] obtain[] money or property by means of false or fraudulent pretenses, representations, or promises."

James Knips, denied that the Christmas Palace was ever a sponsor of the Christmas show. Ellisor paid Knips several visits between October and November 2003. On his first visit, Ellisor informed Knips that "all the ambassadors from all over the world were behind this and supportive of [Ellisor's] idea and plan that [Ellisor] has done in the past." Ellisor also told Knips that the University of Miami, Doubletree Hotel, and the fire and police departments of the City of Miami were sponsors of the show. Although Ellisor repeatedly asked Knips to become a sponsor and to donate Christmas trees and decorations, Knips consistently declined. He did, however, offer to sell Christmas decorations "at cost," and gave Ellisor 10,000 Christmas Palace brochures, believing that Ellisor would enclose them in University of Miami alumni mailings. Ellisor then ordered 35 artificial Christmas trees through Knips. Although Knips duly procured the trees, Ellisor never paid for or took possession of them.

On a subsequent visit, Ellisor showed Knips the glossy flier indicating that the Christmas Palace was presenting the evening shows. Ellisor explained that because the daytime shows had already sold out, he was "going to have corporate sponsors for the parents to go at nighttime and do the same event and that was selling out fast also." Knips replied that he was still not interested in being a sponsor and wanted the Christmas Palace's name taken off the flier. Ellisor

11

assured him that it was just a mock-up.

Knips had earlier given Ellisor the Christmas Palace's Federal Express account number so that Ellisor could send a packet of information about the show to Knips. He testified that he did not, however, authorize Ellisor to make further use of the account number. Knips subsequently discovered that Ellisor had sent packets of materials to schools using the Christmas Palace's Federal Express account number; the total amount charged was $1,863.

Several employees of the Doubletree Hotel also testified that the hotel was never a sponsor of the Christmas show; indeed, there was no record that Ellisor ever made such a request. Employees also testified that Ellisor showed them expensive purchases he had made, including a $5,000 watch and expensive clothing, and that Ellisor's hotel room contained only posters – no Christmas trees, gifts, or decorations.

A number of witnesses testified that Ellisor failed to take the necessary steps to stage the Christmas show. Wright testified that Ellisor never paid the remaining balance on the use fee, nor did he obtain an assembly permit, an occupational license, or an insurance policy.[8] The special events coordinator at the City of

---

[8] Wright testified that he received a certificate of insurance on December 4. However, on cross-examination, Ellisor admitted that the check he used to procure the insurance policy bounced for nonsufficient funds.

Miami Fire Rescue testified that there were no records that Ellisor ever contacted the fire department to obtain the necessary approvals for the Christmas show, let alone asked it for sponsorship. Michael Schott, the owner of Party Caterers, testified that he met Ellisor at the convention center shortly before the show was to begin and judged from its appearance that no show would be occurring. He asked Ellisor for his money back, but Ellisor told him to wait until after the show. Schott never set up anything at the convention center because he and Ellisor never planned the menus nor discussed what would be appropriate to serve.

A financial auditor from the United States Attorney's office testified as to his review of Ellisor's Bank of America records in connection with the University Diplomatic Trust Account. That review revealed that although both Ellisor and his friend, Mark B. Weiser, were signatories to the account, there is no record of any account activity by Weiser. According to the records, Ellisor wrote checks to himself, Angela Saiza Bailey, Walt Hines, and a dry cleaner. The record of debit card activity reveals a slew of personal purchases, including charges at Publix, Walgreens, Tire Kingdom, Cavalier Wine Cellar, Sunglass Hut, Blockbuster Video, and Nextel Wireless.

Finally, the Government also introduced evidence and testimony that Ellisor sold $10 tickets to schoolchildren in California, Missouri, Colorado, and Arizona

in connection with a show called "Washington D.C. on Tour." The invitation promised that the show, scheduled for November 22, 1999, at the Salt Lake City Marriott Hotel in Utah, would "consist[] of 41 exhibits of art and history about our nation's capital and the federal government." Ellisor cancelled the show and was subsequently fined $31,200 by the Utah Department of Commerce, Consumer Protection Division, based on his failure to pay refunds to consumers within 30 days, for committing a deceptive act in violation of the Consumer Sales Practices Act, U.C.A. § 13-11-4. At the close of the Government's case, Ellisor moved for a judgment of acquittal, which was denied.

Ellisor called his ex-girlfriend, Angela Saiza Bailey, and Walter Hines to the stand, then took the stand himself. Bailey testified that Ellisor lived with her for three or four months prior to the show. During those months, he acquired a computer, a printer, and labeling equipment, and fielded phone calls relating to the show from her house. Ellisor enlisted the help of her children in preparing for the show. Bailey also claimed to have seen prizes in Ellisor's suite at the Doubletree Hotel, and testified that the watch that Ellisor purchased did not cost more than $500. On cross-examination, Bailey admitted that she never saw any Christmas trees, either at her home or in the Doubletree Hotel, and that her children's role in working on the Christmas show was limited to stuffing envelopes and wrapping

14

some gifts.

Walt Hines testified that Ellisor asked him to write a letter to have the University of Miami sponsor a booth with an art exhibit that would be displayed at the Christmas show. Ellisor told Hines that the university would get a check from the profits. Believing that it would be "a good fundraiser," Hines wrote such a letter on April 10, 2003.[9] He believed that the university's involvement with the show would end with its sponsorship of a booth; he was unaware of the use of his name on the Christmas show's invitation letter. Hines then selected 25 of his students from foreign countries and had them create posters about Christmas in their home countries. He took those posters to the show on December 3. Hines also met with an employee of the Christmas Palace and showed him some materials explaining the tradition of Christmas in other countries, so that the Christmas Palace would understand how to decorate the Christmas trees. Finally, Hines testified that a week before the Christmas show was supposed to begin, he contacted three or so embassies to bring artwork from their countries to the show.

On cross-examination, Hines clarified that he became upset at Ellisor when he discovered that Ellisor had used his letter as part of the promotional materials

---

[9] Hines did not send the letter to the university for approval. He was subsequently discharged from his post in the art department for using the letterhead of the University of Miami without permission.

sent to the schools. However, Ellisor "more or less talked [Hines] into going along with it." Ellisor also pressured Hines into receiving the school checks in his university mailbox and depositing them on Ellisor's behalf. According to Hines, on December 2, Ellisor told him that he would call the schools to cancel the event, but later that evening said he had decided merely to postpone the show. Hines never heard from Ellisor again.

Finally, Ellisor took the stand to testify on his own behalf. Ellisor introduced himself to the jury as a private detective, the diplomatic liaison for the International Diplomatic Corps, a show producer, and a guitarist. Ellisor began by defending his ability to marshal the necessary diplomats, claiming that he personally had 56 embassies under contract and could "bring those embassies wherever [he] want[ed] to bring them." He admitted that no ambassador was specifically coming to the Christmas show, but pointed to a disclaimer on the invitation materials that "specific ambassadors may or may not appear."

Ellisor's explanation for the Christmas show's demise was that half of the schools that initially registered subsequently cancelled their reservations; accordingly, the show was under-subscribed. Facing budgetary constraints, Ellisor testified to a change of plan: "the children [would] do the ornaments. And they would come in, walk around and put them in. And the diplomats . . . [would]

16

come and bring artwork, their personal artwork from their house[s]." He thought that he could purchase Christmas trees for twenty or thirty dollars apiece from the fire department's Christmas tree lot, and that the police department would provide the gifts from its Toys-for-Tots program.

Cross-examination exposed numerous holes in Ellisor's testimony, only several of which we shall recount here. First, Ellisor's description of the target audience of the Christmas show was inconsistent with his own testimony and that of other witnesses. Ellisor insisted that he told Knips: "If he would decorate the hall, that we would allow him to sell retail and he would have the exclusive of the thousands of families, the richest families in Miami from the private schools."[10]

Second, Ellisor offered a bevy of conflicting explanations for why he never called the schools to notify them of the show's cancellation or postponement. His first explanation was that he intended the students and teachers to show up on the

---

[10] Ellisor's testimony on this matter appears at variance with the trial testimony of the Enterprise Rent-a-Car agent who delivered Ellisor's rental vehicle to the Doubletree Hotel. She testified that Ellisor told her he was preparing a Christmas show "for children from the urban schools that would not normally get Christmas presents and he was trying to help the schools and trying to have children receive Christmas presents for the holidays." He requested, and received, a discount rate for the Cadillac De Ville because he claimed "he didn't want to take money from the children."

The claim that the show was going to be attended by the pampered progeny of the wealthiest families in Miami is also at odds with Ellisor's testimony that he thought the gifts for the children were going to be provided by the Miami police department as part of a Toys-for-Tots program.

day of the show, bearing an additional $20,000 in checks. With that money, he would purchase gifts for the students; and with the leverage of the media, he would be able to pressure the convention center to let the students inside. The students would then help set up the show. The second explanation was that Ellisor told Hines to call the schools on December 2, and that Ellisor would follow up with telephone calls over the next few days. The third explanation was that Ellisor was going to call the teachers on December 2, but he could not because he did not have their home telephone numbers. When forced to admit that he did have them, Ellisor shifted gears to a fourth explanation – that he chose not to do so "strategically": "[i]t would be better for everyone to have gone down there and dealt with it, you know, on the spot."

Third, Ellisor's testimony that the $5,000 check he gave to the convention center on November 13, 2003, bounced because of a double debit by Bank of America was inconsistent with bank records. Those records showed there was never any double debit by Bank of America, and that Ellisor withdrew $3,980 from an ATM – leaving $5.60 in the bank account – on November 14, 2003, the same day that the convention center tried, unsuccessfully, to cash the check.

Fourth, Ellisor initially portrayed Gregory Wright as a sympathetic character, one who worked very hard on the show and tried to make it succeed.

18

On cross-examination, however, Ellisor admitted that he had previously assigned the primary blame for the show's failure to Wright.[11]

Finally, Ellisor attributed his in-room movie charges at the Doubletree Hotel to "rock and roll movies" viewed by University of Miami students who helped him work on the show, which was contradicted by the Government's evidence that they were actually charges for evening adult movies.

At the close of the Government's evidence, Ellisor renewed his motion for judgment of acquittal, which was denied. After deliberating for two hours, on February 7, 2005, the jury returned a verdict of guilty as to all eight counts of mail fraud. Ellisor was sentenced to 87 months' imprisonment for each count, to be served concurrently, three years' supervised release, an $800 assessment, and $38,509.09 in restitution. Ellisor timely appealed.

## II.

The opening salvo in this appeal is a challenge to the sufficiency of the evidence. However, because this argument depends on the claim that the district court improperly admitted extrinsic act evidence that tainted the evidence as a

---

[11] Ellisor made a number of vituperative claims about Wright. He stated that Wright "represent[ed] the interests of the Devil" in preventing "Christian children from celebrating the birth of Christ," and that Wright's "criminal destruction was responsible for canceling" the show and "betray[ing] the entire international diplomatic corps."

whole, we address the latter claim first. For ease of discussion,[12] we then turn to the other evidentiary challenge, the argument that the court improperly excluded evidence of Ellisor's legitimate business conduct. Having disposed of these challenges, we return to the sufficiency of the evidence.

A.

Ellisor challenges evidence of two incidents introduced by the Government at trial. First, the Government adduced evidence of Ellisor's misconduct in Utah relating to the "Washington D.C. on Tour" show. Second, the Government introduced evidence that from November 6–21, 2003, Ellisor stayed at the Doubletree Hotel in Coconut Grove and then absconded without formally checking out, leaving behind $1,657 in unpaid charges. Ellisor appeals the district court's decision permitting evidence of both incidents over his objection pursuant to Federal Rule of Evidence 404(b). We deal first with the evidence of Ellisor's misconduct in Utah, then address the evidence of the unpaid bill at the Doubletree Hotel.

Rule 404(b) provides that:

---

[12] The same standard of review applies to these two claims. Because a trial court has broad discretion to determine the admissibility of evidence, we do not disturb evidentiary rulings absent a clear abuse of discretion. United States v. Williford, 764 F.2d 1493, 1497 (11th Cir. 1985).

20

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b). The rule is "one of inclusion which allows [extrinsic] evidence unless it tends to prove only criminal propensity. The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite." United States v. Stephens, 365 F.3d 967, 975 (11th Cir. 2004) (quoting United States v. Cohen, 888 F.2d 770, 776 (11th Cir. 1989)) (internal quotation marks omitted).

To be admissible under Rule 404(b), evidence of prior bad acts must withstand a three-part test:

(1) the evidence must be relevant to an issue other than defendant's character;
(2) the probative value must not be substantially outweighed by its undue prejudice;
(3) the government must offer sufficient proof so that the jury could find that defendant committed the act.

United States v. Ramirez, 426 F.3d 1344, 1354 (11th Cir. 2005); see also United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc) (discussing these three prerequisites as part of a two-step test).[13] "We review the district court's

_____

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to

admission of prior crimes or bad acts under [Rule 404(b)] for abuse of discretion."

Ramirez, 426 F.3d at 1354.

On appeal, Ellisor does not dispute the third requirement of the three-part test. Rather, he assails the relevance and probative value of the evidence; he claims that the evidence is irrelevant because it does no more than establish that he "was required to pay a civil fine in Utah," and he contends that the prejudicial value of the evidence substantially outweighs its probative value.[14]

We find that the district court did not abuse its discretion by admitting evidence of Ellisor's misconduct in Utah. Contrary to Ellisor's argument, the evidence did not simply establish the fact that he was subject to a civil fine in Utah. As argued by the Government, the evidence was relevant to an issue other than Ellisor's character – his intent to defraud by promoting an illusory show.[15] See Beechum, 582 F.2d at 911 ("Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives

October 1, 1981.

[14] We do not address Ellisor's argument that evidence of the Utah fine is "not inextricably intertwined with the charges in this case" because the Government does not argue that it is.

[15] The Government initially claimed that the evidence was offered to show Ellisor's "intent to defraud, his knowledge of the scheme, the absence of mistake or accident, his identity, and his motive, plan and opportunity to defraud." On appeal, the Government states merely that the evidence showed Ellisor's fraudulent intent. Because we agree with the Government's argument, we do not discuss the possibility that the evidence is relevant to these other purposes as well.

from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses.").

The evidence was also probative. In assessing the probative value of the extrinsic evidence, we evaluate the Government's incremental need for the evidence to prove guilt beyond a reasonable doubt, "the overall similarity of the extrinsic and the charged offenses and the closeness or remoteness in time of the charged to the extrinsic offense." United States v. Parr, 716 F.2d 796, 805 (11th Cir. 1983). The Government introduced evidence of the Utah misconduct in its case in chief, but it was clear before the case proceeded to trial that Ellisor's intent would be the primary disputed issue. See Beechum, 582 F.2d at 915. Specifically, Ellisor's defense was that the cancellation of the Christmas show was the unintended result of Wright's bungling and sluggish ticket sales. The Government therefore had need of the evidence in its case in chief to prove Ellisor's fraudulent intent. See Parr, 716 F.2d at 805 (noting that "the government presented a substantial but not overwhelming case on the intent issue. Additional evidence relevant to an intent to defraud cannot be said to have been unnecessary").

The similarities between the incidents were also striking. The Utah incident involved an invitation to schoolchildren to view art and history exhibits from various federal agencies in Washington, D.C. for the cost of a $10 ticket.

23

Although Ellisor reserved a facility at the Marriott Hotel, the hotel never received a $5,000 deposit for its use fee and therefore cancelled the reservation. The similarities between the Utah incident and the charged offense make it more probable that Ellisor never intended to make good on his promises. See Ramirez, 426 F.3d at 1354 ("A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense."); United States v. LaSpesa, 956 F.2d 1027, 1036 (11th Cir. 1992) (admitting extrinsic evidence of a previous incident that "was virtually identical to the transactions described in the indictment, and was highly probative of [the defendants'] fraudulent intent with respect to the charged transactions"). Although the events relating to the Utah misconduct occurred between November 1999 and February 2000 while the offense charged occurred in September through December 2003, given the high degree of similarity between the two, the temporal separation of the two does not significantly depreciate the probative value of the Utah misconduct. See Beechum, 582 F.2d at 915.

We cannot say that the probative value of this evidence was substantially outweighed by the risk of undue prejudice. The district court here did not give a limiting instruction at the time the evidence was admitted. Ellisor did not request

such an instruction, nor did he object to its omission.[16]  While the "scalpel" of an appropriate limiting instruction at the time the evidence was admitted can reduce the risk of inherent prejudice, cf. United States v. Cancelliere, 69 F.3d 1116, 1123 (11th Cir. 1995), given the probative force of the evidence and the fact that the evidence was properly argued by the Government in its closing argument to the jury,[17] we conclude that the district court's admission of the evidence did not constitute an abuse of discretion.  See Parr, 716 F.2d at 805 (finding extrinsic evidence was properly admitted despite the absence of a limiting instruction due to the nature of the extrinsic evidence and the minimal prejudice resulting from its admission).

As for the evidence of the unpaid bill at the Doubletree Hotel, the Government claims that it is not extrinsic evidence subject to Rule 404(b) because it is "inextricably intertwined" with the evidence relating to the charged offense.

---

[16] Because Ellisor did not request a limiting instruction, the district court's failure to give an instruction at that time was not error; nor do we find that the absence of such an instruction amounted to plain error which "seriously affected the fairness, integrity, or public reputation of judicial proceedings."  See United States v. Miranda, 197 F.3d 1357, 1360 & n.4 (11th Cir. 1999).

[17] The Government in its opening statement at the outset of trial informed the jury that Ellisor was "not on trial for what happened in Utah," and that evidence of the Utah misconduct was offered in order to show Ellisor's "intent to defraud in this case."  In closing, the Government referred to the evidence only in rebuttal, to refute Ellisor's claim that he was merely lacking in business acumen.  The district court also instructed the jury during the final charge that Ellisor was "on trial only for the specific offenses alleged in the indictment."

25

While it is difficult to discern the specific contours of Ellisor's challenge to the hotel bill evidence due to the "shotgun" style of argument in this portion of his brief,[18] he disputes the finding that this evidence is "inextricably intertwined" with the offense with which he was charged.

The evidence of Ellisor's unpaid hotel bill was not extrinsic. Evidence of criminal activity other than the offense charged is not extrinsic provided that the evidence is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Jiminez, 224 F.3d 1243, 1249 (11th Cir. 2000) (quoting United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998); see also United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the

_____

[18] We note that Ellisor does little more than assign error to this issue, as this portion of his brief contains no argument and cites to no legal authority, and merely states that "[t]he same argument and case law advanced above applies [sic] here." See United States v. Campbell, 491 F.3d 1306, 1315 (11th Cir. 2007).

26

jury.").

Here, the unpaid bill at the Doubletree Hotel was inextricably intertwined with the Government's evidence pertaining to the Christmas show. The charges on the bill were incurred in November 2003, in the weeks immediately preceding the dates advertised for the show. Ellisor used the name of the hotel on materials advertising the show and in conversations with teachers and businesses to bolster the show's legitimacy, contrary to the testimony of witnesses who denied that the Doubletree Hotel was ever a sponsor of the show in any fashion. Evidence of the unpaid bill corroborated the Government's theory that, consistent with the intent to defraud, Ellisor was spending the money on discretionary purchases for himself and not, as Ellisor maintained, on preparations for the show. Ellisor testified that although he contemporaneously paid rent to his then-girlfriend for occupying her house, the suite at the Doubletree Hotel was a necessary business expense because he needed a separate office to plan and prepare for the show. Consequently, the unpaid bill was a necessary part of the evidence relating to the charged offense, and the district court did not abuse its discretion by admitting it.

B.

Ellisor claims that the district court erred in granting the Government's pretrial motion in limine to preclude Ellisor from introducing extrinsic evidence of

27

purportedly legitimate business activities in order to negate evidence of his fraudulent intent with respect to the Christmas show. Specifically, Ellisor sought to introduce a DVD produced by him that advertised a prior show, as well as correspondence purportedly demonstrating that Ellisor had produced other shows over a ten-year period. On appeal, Ellisor contends that because the Government was permitted to introduce evidence of the Utah misconduct and evidence of the unpaid Doubletree Hotel bill, the district court abused its discretion by preventing him from presenting the DVD and correspondence to negate such evidence of intent. The argument is devoid of merit.

Because "[e]vidence of good conduct is not admissible to negate criminal intent," the DVD and correspondence were properly excluded. United States v. Camejo, 929 F.2d 610, 613 (11th Cir. 1991).[19] We have previously held such evidence to be inadmissible. The fact that Ellisor purportedly produced other shows does not bear on his intent to defraud with respect to the Christmas show,

---

[19] Luis Setien was one of several defendants who were charged with conspiracy to import and distribute cocaine through the use of commercial flights. United States v. Camejo, 929 F.2d 610, 612 (11th Cir. 1991). At trial, Setien sought to admit the testimony of Max Mermelstein, who would testify that during the relevant time period, he had offered Setien the opportunity to quit his job as a baggage handler and work in Mermelstein's narcotics business, an offer which Setien declined. Id. at 612–13. Setien contended that Mermelstein's testimony was necessary to negate the element of mens rea necessary to convict him of conspiracy to import cocaine, as the testimony "was relevant to show he was offered an opportunity to do the same thing and refused." Id. at 613. The district court granted the government's motion in limine on the basis of Federal Rules of Evidence 405(b) and 404(b), and we affirmed. Id.

and is therefore irrelevant.[20]  See United States v. Marrero, 904 F.2d 251, 260 (11th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.").[21]  These specific acts of good character were inadmissible under Rules 404(b) and 405(b)[22] to prove Ellisor's action in conformity therewith.  See Camejo, 929 F.2d at 613; Marrero, 904 F.2d at 259–60.[23]  Finally, as the Government argues and Ellisor does not refute, the

---

[20] The rules of evidence proscribe the admission of irrelevant evidence, defined as evidence with has no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401, 402.

Even if such evidence were relevant, the evidence would be inadmissible under Rule 403, as any marginal probative value of the evidence would be vastly outweighed by the risk of confusion of the issues, misleading the jury, and considerations of undue delay and waste of time.  Fed. R. Evid. 403.  In particular, the trial would be greatly prolonged by the Government's need to present evidence in rebuttal, namely, evidence that the shows referenced by the DVD and correspondence were not, in fact, successful endeavors.

[21] Lucy Marrero was charged with presenting false insurance claims to a federal agency and for theft of government property based on improper billing practices.  United States v. Marrero, 904 F.2d 251, 253 (11th Cir. 1990).  To bolster her defense of lack of motive or intent, Marrero "sought to introduce evidence which showed that she provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge."  Id. at 259.  We affirmed the district court's exclusion of the evidence of these specific acts as irrelevant and inadmissible under Federal Rule of Evidence 405(b).  Id. at 259–60 ("Marrero sought at trial to use specific acts circumstantially to prove lack of intent.  Such a tactic is not only disfavored, it is not permitted under Rule 405(b).").

[22] Specific instances of conduct are inadmissible as character evidence, except "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense."  Fed. R. Evid. 405(b).

[23] Having reviewed the cases cited by Ellisor in support of his claim, we find they are too inapplicable to merit discussion.

29

DVD and correspondence were properly excluded on the grounds of hearsay, as they were offered for the purpose of admitting out-of-court statements attesting to the truth of the assertion that Ellisor had previously produced successful shows.

In sum, the evidence was properly excluded by the district court.

## C.

Ellisor contends that, were it not for the introduction of the extrinsic act evidence discussed in part II.A, supra, there would be insufficient evidence as a matter of law to support his conviction. Accordingly, he claims that the district court erred in denying his motion for judgment of acquittal as to all counts.

Ellisor concedes that the only issue for the jury was whether he possessed the requisite intent to commit the fraud charged. He maintains that he did not; that his steadfast intention to put on the show was blunted by the "sad result that the event was woefully under subscribed and could not go on." In support of this claim, he points to his own testimony, Walt Hines's testimony that "a lot of work was done in preparing the artwork and decorations for the show," and other witness testimony indicating that Ellisor paid a deposit to the convention center, purchased an insurance binder, and met with business owners.

The main flaw in Ellisor's argument is that he misconceives a crucial aspect of the standard of review. A judgment of acquittal is warranted as to "any offense

30

for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In considering the sufficiency of the evidence, we regard the evidence in the light most favorable to the jury verdict, and draw all reasonable inferences and credibility determinations in favor of the Government. United States v. Puche, 350 F.3d 1137, 1142 (11th Cir. 2003). Ellisor mistakenly argues that the district court erred because "reasonable minds could have differed as to the result." "Because we recognize that the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial." United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007) (internal quotation marks and citation omitted). In other words, the question is whether reasonable minds <u>could</u> have found guilt beyond a reasonable doubt, not whether reasonable minds <u>must</u> have found guilt beyond a reasonable doubt. See also United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.") (citation omitted).

Here, there was ample evidence from which a reasonable jury could

31

conclude beyond a reasonable doubt that Ellisor possessed the requisite intent to defraud. In addition to the evidence of the Utah misconduct described above, the Government adduced evidence that although Ellisor collected money from schools and businesses in the name of the Christmas show, he spent the money on purchases for himself, including a suite at the Doubletree Hotel, a luxury car rental, and expensive clothing. Beyond paying an initial deposit and purchasing an insurance binder, Ellisor took no further steps toward procuring the convention center. The Government portrayed Ellisor as having performed the bare minimum to preserve the appearance that the show would occur, so that he could continue collecting money from schools – which he did right up until the eve of the show. Testimony at trial flatly contradicted Ellisor's claims that the show was sponsored by the University of Miami, the Doubletree Hotel, the Christmas Palace, and the Miami police and fire departments. There was no evidence that Ellisor was ever a diplomatic liaison for the International Diplomatic Corps, and no evidence that any ambassadors were to attend the show. Ellisor never called anyone to inform them of the show's cancellation, effectively emptied the University Diplomatic Trust Account of its remaining funds, and purchased a Jaguar. Finally, the Government emphasized the great disparity between what was promised and what was delivered. "Christmas From Around the World" was billed as featuring 28

32

foreign ambassadors, Harry Potter characters, lavish Christmas decorations, raffle prizes, and even live reindeer. When the children showed up at the convention center on the morning of December 3, the convention center was locked and bare.

Ellisor took the stand and testified that he never intended to defraud anyone. The jury was free to disbelieve Ellisor's statements and to take them as substantive evidence to the contrary. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt. . . . To be more specific . . . when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.") (emphasis, internal quotation marks, and citation omitted). "Where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in [his] own defense, the [d]efendant's testimony, denying guilt, may establish, by itself, elements of the offense." United States v. Williams, 390 F.3d 1319, 1326 (11th Cir. 2004). "This rule especially applies where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." United States v. Svete, 2008 U.S. App. LEXIS 6219, at *15–16 (11th Cir. Mar. 26, 2008) (quoting Brown, 53 F.3d at 315) (internal quotation marks omitted). Ellisor's testimony, together with the mountain of evidence

33

discussed above, was more than sufficient to support the jury's verdict of guilty beyond a reasonable doubt. We therefore affirm the district court as to all counts.

### III.

The presentence investigation report ("PSI") suggested a base offense level of 7 for Ellisor's mail fraud convictions. U.S.S.G. § 2B1.1. The PSI further increased the base offense level by: (1) six levels under § 2B1.1(b)(1)(D) because the loss was between $30,000 and $70,000; (2) six levels under § 2B1.1(b)(2)(C) because the offense involved more than 250 victims; (3) two levels under § 2B1.1(b)(8)(A) because the offense involved the misrepresentation that he was acting on behalf of an educational organization; (4) two levels under § 3A1.1(b)(1) because Ellisor knew or should have known that the victims of the offense were vulnerable; and (5) two levels under § 3C1.1 because Ellisor willfully obstructed justice during the proceedings. With no adjustments, the total offense level was therefore 25. With that total offense level and a criminal history category of III, Ellisor's Sentencing Guidelines range was 70 to 87 months' imprisonment.[24]

In the post-Booker sentencing regime, "a sentence may be reviewed for

---

[24] The statutory maximum term of imprisonment for mail fraud is 20 years. See 18 U.S.C. § 1341.

34

procedural or substantive unreasonableness." United States v. Hunt, 459 F.3d

1180, 1182 n.3 (11th Cir. 2006).  In Gall v. United States, the Supreme Court set

forth a number of grounds for significant procedural error, including "failing to

calculate (or improperly calculating) the Guidelines range, treating the Guidelines

as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based

on clearly erroneous facts, or failing to adequately explain the chosen sentence."

552 U.S. ___, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007).  Once an appellate

court has satisfied itself that the district court followed proper sentencing

procedure, the court then evaluates "the substantive reasonableness of the sentence

imposed under an abuse-of-discretion standard."  Id.[25]

---

[25] We review both the procedural and substantive reasonableness of the sentence under an abuse-of-discretion standard, Gall, 552 U.S. at ___, 128 S. Ct. at 597, but the degree of deference that is due varies with the type of procedural error alleged.  "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous."  Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) (quoting Martin v. Automobili Lamborghini Exclusive, Inc., 307 F.3d 1332, 1336 (11th Cir. 2002)) (internal quotation marks omitted); see also Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L. Ed. 2d 392 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1253 (11th Cir. 2005) ("We review the district court's . . . application of the law de novo, premised on the understanding that application of an improper legal standard is never within a district court's discretion.") (internal quotation marks and citation omitted).  "A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner."  Klay, 376 F.3d at 1096.

We therefore "review de novo the district court's interpretation of the Guidelines and its application of the Guidelines to the facts," and "[w]e review for clear error the district court's findings of fact regarding whether a defendant should receive an enhanced sentence under the . . . Guidelines."  Campbell, 491 F.3d at 1315 (internal quotation marks and citations omitted).  "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

In his brief, Ellisor lists several challenges to the sentencing procedure used by the district court.[26]  In part III.A, infra, we first consider and reject Ellisor's claims that the district court erred in its imposition of certain sentencing enhancements.  In part III.B, infra, we find that the district court did not commit procedural error with respect to its grant of an upward departure in Ellisor's criminal history category.[27]

A.

1.

Based on its calculation that the amount of loss stemming from Ellisor's

---

committed."  United States v. Robertson, 493 F.3d 1322, 1330 (11th Cir. 2007) (internal quotation marks and citation omitted).  At a minimum, there must be substantial evidence to support a factual finding.  Id.  "The district court's factual findings for purposes of sentencing may be based on, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing."  United States v. Polar, 369 F.3d 1248, 1255 (11th Cir. 2004).

[26] Ellisor does not claim that his sentence was substantively unreasonable.

[27] Ellisor also contended that under United States v. Booker, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), and Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), his sentence violated the Ex Post Facto Clause, the Due Process Clause of the Fifth Amendment, and his Sixth Amendment right to trial by jury because the district court found and considered sentencing facts not found by a jury or admitted by the defendant.  Our case law clearly indicates that no such violation occurred here, where the district court treated the Sentencing Guidelines as advisory and considered sentencing facts that it found under a preponderance of the evidence standard.  See United States v. Smith, 480 F.3d 1277, 1281 (11th Cir. 2007) (citing United States v. Chau, 426 F.3d 1318, 1322–23 (11th Cir. 2005)); United States v. Martinez, 434 F.3d 1318, 1323 & n.5 (11th Cir. 2006) (citing United States v. Duncan, 400 F.3d 1297, 1307 (11th Cir. 2005)); United States v. Rodriguez, 398 F.3d 1291, 1300 (11th Cir. 2005).  In any case, Ellisor withdrew his claim as to this issue at oral argument.

36

fraud scheme was $41,878.51, which falls between $30,000 and $70,000, the district court imposed a six-level enhancement to Ellisor's base offense level pursuant to § 2B1.1(b)(1)(D).  Ellisor argues that the total loss incurred fell below $30,000, warranting only a four-level enhancement.  See U.S.S.G. § 2B1.1(b)(1)(C).

Ellisor acknowledges that several schools sent a total of $24,100 in checks that were deposited in the University Diplomatic Trust Account.  He also recognizes the loss to Bank of America[28] of $3,914.49, which was incurred because Ellisor was able to withdraw funds from checks that had stop-payment orders placed on them.  These two loss items equal $28,014.49.

At sentencing, the Government argued that additional items easily placed the total amount of loss well above $30,000, including losses incurred by Party Caterers ($7,804.93), the Doubletree Hotel ($1,657.47), and the Christmas Palace by virtue of Federal Express charges ($1,862.62).[29]  In his brief, however, Ellisor specifically challenges the inclusion of losses to the Doubletree Hotel and the

---

[28] In his brief, Ellisor mistakenly states that Bank of America lost $3,830.  As properly calculated in the PSI, the bank also lost related fees for a total of $3,914.49.  We note, however, that using the $3,830 figure would not change the ultimate calculation that the total loss exceeds $30,000.

[29] Based on these figures, the total loss is actually $41,834.51, not $41,878.51 as calculated in the PSI – an insignificant discrepancy.

Christmas Palace. Ellisor argues that the loss to the Doubletree Hotel is "not part of the loss attributable to the fraud charged,"[30] and the loss to the Christmas Palace "was just the cost of doing business and a bad investment by the Christmas Palace."

We are unpersuaded by this attempt to knock down straw men. Even putting aside the losses suffered by the Doubletree Hotel and the Christmas Palace, Ellisor admits that the district court's sums included the amount of $2,495 which Ellisor collected in cash disbursements from St. Timothy's Parish School. Quite understandably, Ellisor offers no argument that this amount ought to be excluded from the total loss caused by the fraud scheme. As it is a mathematical fact that the sum of $28,014.49 and $2,495 is greater than $30,000, the district court did not commit clear error in finding that the amount of loss exceeded $30,000.

2.

Ellisor also argues that the district court erred in the enhancements imposed based on the number of victims and their vulnerability. First, he argues that the

---

[30] On the contrary, we have held that "in calculating the amount of loss, the Guidelines require a district court to take into account not merely the charged conduct, but rather all relevant conduct, in calculating a defendant's offense level." United States v. Foley, 508 F.3d 627, 633 (11th Cir. 2007) (internal quotation marks and citation omitted).

number of victims is less than 50, a two-level enhancement. See U.S.S.G. § 2B1.1(b)(2)(A). His theory in support of this calculation is that the only victims of the fraud were the schools, which, as entities, number no more than 23. The district court rejected this theory and accepted the Government's argument that the victims of the fraud were the students and parents – more than 2,700 of them – who paid $10 per ticket, as well as the schools that paid for bus transportation. Accordingly, the district court applied a six-level enhancement pursuant to § 2B1.1(b)(2)(C).

"Whether a person is a victim" under the Sentencing Guidelines "is a legal conclusion we review de novo." United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007) (citation omitted). The relevant commentary to the Guidelines defines a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. Accordingly, "the number of victims is defined in relation to the loss calculation," Foley, 508 F.3d at 633, which in turn is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i).

Applying these definitions, we cannot find that the court erred in determining that the students and parents were persons who sustained a part of the reasonably foreseeable pecuniary harm that resulted from the fraud scheme. It was

39

the students and parents who each paid the $10 fee per ticket; the schools merely collected and consolidated that money into checks for purposes of administrative ease. In an unpublished opinion, we rejected a defendant's claim that husbands and wives should not be counted as separate victims where the fraudulently obtained money "was derived from jointly held accounts or the investment was made on behalf of both persons." United States v. Densmore, 210 Fed. Appx. 965, 971 (11th Cir. 2006). We recognized that even in the case of money held jointly by a marital couple, both the husband and wife count as victims because each sustains a "part of the actual loss." Id. A fortiori, there is no merit to Ellisor's argument that the fact that the schools consolidated the ticket money into group checks precludes the counting of the students and parents as individual victims.

Second, Ellisor argues that the district court violated the Guidelines by applying the two-level enhancement for vulnerable victims pursuant to § 3A1.1(b)(2), because the district court had already imposed an enhancement under § 2B1.1(b)(2)(C). Ellisor mislabels the district court's actions. In accordance with the PSI, the district court did not apply § 3A1.1(b)(2) – a two-level enhancement if "the offense involved a large number of vulnerable victims" – but instead applied § 3A1.1(b)(1), a two-level enhancement if the victim is vulnerable. Thus, the commentary forbidding an enhancement under

§ 3A1.1(b)(2) where the defendant has already received an enhancement under § 2B1.1(b)(2)(B) or (C) is inapplicable.  See U.S.S.G. § 2B1.1 cmt. n.4(D).

3.

The district court applied a two-level enhancement pursuant to § 2B1.1(b)(8)(A) because the offense involved the misrepresentation that Ellisor was acting on behalf of an educational organization, namely, the University of Miami.  Ellisor contends that this factual finding was not supported in the record.  Specifically, Ellisor claims that it was Walt Hines who "overstepped his bounds" and did not follow the University of Miami's internal policy procedures.  At trial, however, Hines testified that Ellisor obtained the April 10, 2003 letter from him under false pretenses – that it would be used solely to garner corporate sponsors for booths – and furthermore, that Ellisor forged Hines's signature on subsequent letters on University of Miami letterhead.  Other witnesses testified that Ellisor claimed the University of Miami was a main sponsor of the show, and according to Wright, Ellisor claimed that the University of Miami had hired him to coordinate the show because he was "a great promoter."  Accordingly, the district court did not err in applying this enhancement.

4.

Ellisor also challenges the district court's imposition of a sentencing

enhancement for the obstruction of justice.  Section 3C1.1 provides for a two-level enhancement

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . .

U.S.S.G. § 3C1.1.

In this case, the district court found that Ellisor had willfully obstructed justice by committing perjury as to material matters.[31]  With respect to perjury, the Government identified seven allegedly false and material statements by Ellisor that were directly contradicted by documentary evidence and the testimony of other witnesses: (1) that Ellisor was the diplomatic liaison for the International Diplomatic Corps and had 56 ambassadors and governments under contract; (2) that the Christmas Palace agreed to donate decorations for the Christmas trees and authorized Ellisor's use of its Federal Express account for the show; (3) that Ellisor spoke to the fire department about the show and a fire assembly permit fee; (4) that the presents for the show would be provided by the police department as

---

[31] The Government argued that the obstruction-of-justice enhancement was also warranted by Ellisor's disruptive behavior in the courtroom – such as repeatedly interrupting and distracting the presiding judge, attorneys, and adverse witnesses, and surreptitiously referring to a sheaf of notes while testifying.  However, the district court adopted the findings of the PSI, which recommended the imposition of the enhancement on the basis of perjury alone.

part of a Toys-for-Tots program; (5) that Walt Hines was supposed to notify schools on December 2 of the show's cancellation; (6) that Ellisor had put on the Christmas show twice before;[32] and (7) that the in-room movies charged to Ellisor's room at the Doubletree Hotel were rock and roll movies ordered by students assisting with the show. On appeal, Ellisor contests the materiality of these statements.[33]

Although preferable, it is not necessary for the district court to make specific findings as to each instance of perjury; we may affirm the district court if it has made "a general finding of obstruction of justice that encompasses all of the factual predicates of perjury." United States v. Vallejo, 297 F.3d 1154, 1168 (11th Cir. 2002) (internal quotation marks and citation omitted).[34] Here, the district court heard arguments as to each specific statement identified by the Government and rejected Ellisor's argument that the statements were immaterial. The court

---

[32] Ellisor's claim that he had put on the Christmas show twice before was in violation of the district court's ruling in limine precluding any such evidence or testimony.

[33] The Guidelines define a "material" statement as a statement "that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6. Under this standard, we have held that "the threshold for materiality is conspicuously low." United States v. Dedeker, 961 F.2d 164, 167 (11th Cir. 1992).

[34] The requirements of perjury are that "(1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory." United States v. Singh, 291 F.3d 756, 763 n.4 (11th Cir. 2002).

43

then adopted the PSI's findings that Ellisor's statements were expressly contradicted by the trial testimony of numerous witnesses and substantial physical evidence, and that Ellisor's statements amounted to perjury. The record amply supports the conclusion that Ellisor's statements were not merely denials that he chopped down the cherry tree. We therefore find that the district court did not err in finding that the statements related to material matters, and properly applied the obstruction-of-justice enhancement.

## B.

Ellisor's parting shot is that the district court committed significant procedural error in its decision to grant an upward departure with respect to his criminal history category. Specifically, Ellisor contends that: (1) the district court treated the Sentencing Guidelines as mandatory; (2) the court referred only to U.S.S.G. § 4A1.3(a)(2) and failed to take into consideration the statutory factors enumerated in 18 U.S.C. § 3553(a);[35] and (3) the court based its sentence on

---

[35] Under Booker, after consulting the Guidelines and calculating the range provided for therein, a district court must then consider seven factors set forth in 18 U.S.C. § 3553(a) to reach a reasonable sentence, namely: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [(2)(a)] the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [(2)(b)] the need for deterrence; [(2)(c)] the need to protect the public; [(2)(d)] the need to provide the defendant with needed educational or vocational training or medical care; [(3)] the kinds of sentences available; [(4)] the Sentencing Guidelines range; [(5)] pertinent policy statements of the Sentencing Commission; [(6)] the need to avoid unwanted sentencing disparities; and [(7)] the need to provide restitution to victims." United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005)

44

clearly erroneous facts.

According to the PSI, Ellisor had a criminal history category of I based upon his arrest and guilty plea to two charges of petit theft in 1988. However, the Sentencing Guidelines provide for the possibility of an upward departure "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). Bases for an upward departure include information concerning "[p]rior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order," and "[p]rior similar adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3(a)(2)(C), (E). In accordance with these bases, the Government submitted evidence of Ellisor's December 1999 administrative citation in Utah related to his "Washington D.C. on Tour" show, as well as evidence that Ellisor never complied with the February 2000 order of adjudication. The Government also submitted evidence of formal complaints filed with the attorney general of New Mexico indicating that Ellisor also promoted that show and collected over $30,000 from schools in California, Missouri, Colorado, and Arizona; no refunds were ever given. These complaints

_____

(citing 18 U.S.C. § 3553(a)).

were further corroborated by bank records. Ellisor then produced two witnesses, his ex-girlfriend, Angela Saiza Bailey, and his friend, Mark B. Weiser, who testified that they had helped Ellisor produce a number of shows over the years. On cross-examination, the Government established that none of these shows charged a fee for admission, and suggested that the shows were not successful.

Upon review of the record, we cannot say that the district court erred in its sentencing procedure. After expressly considering the parties' arguments, the PSI, the Guidelines, and the factors set forth in 18 U.S.C. § 3553(a), the district court concluded that neither criminal history category I nor criminal history category II sufficiently represented the seriousness of Ellisor's criminal history and the likelihood of recidivism. As to Ellisor's first argument, it is clear from the transcript of the sentencing hearing that the district court understood and expressly acknowledged the advisory nature of the Guidelines.

Nor did the extent of the court's evaluation of the § 3553(a) factors amount to procedural error in this case. We have rejected the notion that a district court must "recite a laundry list of the § 3553(a) factors" in order to evince the reasonableness of its sentence. United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005); see also United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005) ("[W]hen the district court considers the factors of section 3553(a), it need not

discuss each of them."). Rather, we have held that a court's explicit acknowledgment that it has considered a defendant's arguments and the § 3553(a) factors is sufficient to demonstrate that it has adequately and properly considered those factors. Scott, 426 F.3d at 1330. Here, the district court made clear that it had "considered the factors set forth in 18 U.S.C. [§] 3553(a)(1) through and including (7)." The court found Ellisor's offense to be "reprehensible, to take money from young, impressionable and vulnerable children, children who had every expectation that they were going to attend something very special." The court also found that "Mr. Ellisor has a long track record of engaging in fraudulent behavior that evinces complete and utter disregard for the property of others, and there is no doubt in the court's mind that Mr. Ellisor would resume his pattern of deceitful conduct in the future if given a mere slap on the wrist." In light of the evidence, the court was "convinced that, given the chance, [Ellisor] would do it all over again, and that the only way to protect small children and others from [his] phony operations is to keep [him] behind bars." The court again indicated that it found the term of 87 months' imprisonment to be "a reasonable sentence after considering 18 U.S.C. [§] 3553(a)(1) through and including (7)." We are well satisfied, therefore, that the court "adequately considered the § 3553(a) factors," and that Ellisor's sentence was "the product of conscientious deliberation." See

47

United States v. Campbell, 491 F.3d 1306, 1316 (11th Cir. 2007); see also Rita v.

United States, 551 U.S. __, 127 S. Ct. 2456, 2469, 168 L. Ed. 2d 203 (2007)

(holding that the defendant's sentence was procedurally reasonable when the

district court considered the parties' arguments and provided a reasoned basis for

its choice of sentence).

Third, in support of his argument that the district court based the sentence

on clearly erroneous facts, Ellisor claims that "the Court actually acknowledged

that he may have been 'speculating' in evaluating what may have transpired in the

out-of-state matters." Upon review of the transcript, it is clear that the district

court did not indicate that it was speculating as to whether Ellisor actually

committed the out-of-state acts. Instead, the comment arose during the course of

an exchange in which counsel for Ellisor, Stuart Adelstein, questioned why no

formal charges were filed against Ellisor for those incidents:

> MR. ADELSTEIN: As far as assuming that someone dropped the
> ball, whether it be the State of Utah or New Mexico or the FBI or
> what have you, it's easy to assume that they evaluated –
> THE COURT: I don't know if they dropped the ball or didn't drop the
> ball. All I know is that there were no formal charges filed.
> MR. ADELSTEIN: And it's easy to assume that, after review of the
> case, they could not prove any criminal actions on the part of Mr.
> Ellisor.
> THE COURT: I guess I shouldn't speculate. We shouldn't speculate.
> MR. ADELSTEIN: I agree.
> THE COURT: We do not know what happened.

48

MR. ADELSTEIN: I agree.

THE COURT: All I know is I have to rely on the documents the Government has submitted.

We do not find, therefore, that the district court based its decision to grant an upward departure on clearly erroneous facts. The district court found the evidence of Ellisor's prior similar misconduct in Utah, California, Missouri, Colorado, and Arizona – an administrative citation in Utah, formal complaints filed with the New Mexico attorney general, and corroborating bank records – to be reliable and "completely unrebutted." Specifically, the district court noted that the shows described by Angela Saiza Bailey and Mark Weiser "did not involve the collection of funds."

In sum, Ellisor's sentence was not procedurally unreasonable.

IV.

For the reasons herein stated, the judgment of the district court is AFFIRMED.