[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11324
Non-Argument Calendar

_____

D.C. Docket No. 4:13-cr-00075-MW-CAS-3


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DARIUS JEMMOTT,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(January 9, 2015)

Before JORDAN, JULIE CARNES, and BLACK, Circuit Judges.

PER CURIAM:

During the course of an investigation by Florida state investigators and the Tallahassee police department of possible public assistance fraud, the latter learned that the defendant, Darius Jemmott ("Defendant"), had used a fraudulently-acquired electronic food stamp card, issued to another individual, to make several purchases. After further investigation, a federal grand jury indicted Defendant for conspiring to commit mail and wire fraud (Count 1), for three substantive counts of actually committing wire fraud through his use of this electronic card (Counts 4, 5, 6), and for aggravated identity theft of the person in whose name the fraudulently-acquired card was issued (Count 7), in violation of 18 U.S.C. §§ 1341, 1343, 1349; of 18 U.S.C. §§ 1343 and 2; and of 18 U.S.C. §§ 1028A(a)(1) and 2, respectively.

Defendant was convicted by a jury on all counts,[1] and the district court sentenced him to a one-day concurrent sentence for all counts except for the aggravated identity theft count. On that count, the court imposed a mandatory two-year consecutive sentence. Defendant does not challenge his conviction on the three substantive wire fraud counts. He does challenge his conviction for conspiracy to commit wire fraud and his conviction for aggravated identify theft, as set out in Counts 1 and 7 of the indictment, arguing that the district court erred when it admitted extrinsic acts evidence pursuant to Federal Rule of Evidence

---

[1] Joined in this indictment with Defendant were co-defendants Dwayne Phanor and Rodrigue Bissainthe. Both co-defendants subsequently pled guilty, and Defendant was the only defendant who went to trial.

2

404(b) and when it denied Defendant's two motions for a mistrial based on the latter's argument that government counsel had exceeded the limits placed on the use of this Rule 404(b) evidence by the court.

After careful review, we conclude that the district court did not err and we affirm Defendant's conviction on all counts.

## I.    The Investigation

The United States Department of Agriculture sponsors a program to provide economic assistance to enable qualified low-income persons to purchase food. Known as the Supplemental Nutrition Assistance Program ("SNAP"), the program is administered in Florida by its Department of Children and Families ("the Department").  The program works as follows: an applicant for assistance submits an application to the Department.  If approved, JP Morgan Chase ("JP Morgan"), which also administers part of the program, issues an Electronic Benefits Transfer ("EBT" or "food stamp") card to the approved individual.  This EBT card is sent to the benefit recipient by the United States Postal Service.  The card is typically valid for a six-month period, and, functioning as a debit card, it is loaded with a set amount of money that the recipient can draw down on whenever the card is presented to an authorized merchant.  A recipient who wishes to change the address at which his card is to be sent can do so by telephoning a JP Morgan call center and providing personal identity information, including the recipient's name,

3

date of birth, and social security number.

The investigation leading to the conviction of Defendant began when Department investigators learned that during a two-day period of time, there had been 20 applications for public assistance from 2202 Magnolia Street in Tallahassee, each in a different name, and each indicating that the applicant was in a one-member household with zero income. Suspecting identity theft and fraud, the investigators began probing further and learned from the JP Morgan call center that 47 calls inquiring about making a change of address or seeking other information had been made from a telephone number that was associated with this Magnolia Street address. Further investigation revealed that this same telephone number was also associated with two other Tallahassee addresses where fraudulent applications and potential identity theft were suspected: 706 West Georgia Street and 1001 Ocala Road.

An investigator caught a break when, while visiting a Sunoco gas station where one of the fraudulently-obtained EBT cards had been used, he spotted a male in the act of using this card, which had been issued in the name of a "David M." and had been directed to be sent to the Magnolia Street address. Tracking the driver from the tag number on the car, the investigator obtained driver's license records and learned that the driver and user of the David M. EBT card was not "David M.," but was Darius Jemmott, the defendant in this case. Obtaining an

arrest warrant and later a search warrant, Tallahassee police arrested Defendant as he was driving away from his apartment and thereafter searched Defendant's apartment. The officers found the David M. EBT card in Defendant's pocket, and later learned that he had made multiple charges on this card at local grocery stores and gas stations.

But that is not all that they found. Inside the pocket on the driver's door of Defendant's car, they found an envelope addressed to a "Ronald R." at 1001 Ocala Road, which co-defendant Phanor would later state was an address that had been provided to him by Defendant. Inside this envelope was a debit card representing a tax refund issued by the government to "Ronald R." Further, in the back seat of the car, the officers found notebooks containing 50 lists of names, with associated personal identification information, including social security numbers and dates of birth, as well as four sets of employer ID numbers and numerous unopened, addressed envelopes containing debit cards commonly used for tax refunds. Officers later concluded that these lists and envelopes were related to a stolen identity/income tax refund fraud scheme.

The investigating officers obtained another valuable lead when they spoke to one of Defendant's neighbors as they were arresting Defendant at his apartment. In talking to this neighbor, who turned out to be future co-defendant Dwayne Phanor, the officers learned that Phanor had the same telephone number that had

5

been used to make the 47 calls to JP Morgan to change EBT recipients' addresses. In fact, Phanor had the telephone on him at the time.

Accordingly, the officers took Phanor into custody as well and began their simultaneous questioning of Phanor and Defendant in different interview rooms. In response to questions, Defendant stated that a guy named Fizzle had given him the EBT (food stamp) card issued to "David M.," the envelopes containing debit (tax refund) cards issued to "Ronald R." and various other people, and the lists of personal identification information of numerous people. Defendant stated that he had just met this Fizzle for the first time at a McDonald's, when the latter spontaneously decided to give to Defendant, a stranger until that moment, these electronic cards and personal identification information. Fizzle then asked if Defendant could provide him with an address where he could have future cards sent, and Defendant gave him the 1001 Ocala Road address, where a friend of Defendant lived. Later, Fizzle sold Defendant the "David M." EBT card for $80-100.

Unbeknownst to Defendant, Phanor, who was being questioned in a nearby room, had just admitted that it was he who had sold Defendant the David M. EBT card. The interviewing officer confronted Defendant with Phanor's admission that he had sold the EBT card to Defendant. Defendant then admitted that it was Phanor, not Fizzle, who had sold him the EBT card, but Defendant stuck with his

story that Fizzle had given him the rest of the materials.

In addition, during his interview, Phanor also stated that it was Defendant who had provided him with the Ocala Road address, which was the address of a friend of Defendant's, for Phanor to use.

## II.    Defendant's Motion *In Limine* To Exclude Evidence Discovered in Search of Defendant and His Vehicle

Prior to trial, Defendant had filed a motion *in limine* to exclude admission of any of the evidence discovered during the search of Defendant's vehicle.  As noted, that evidence included the envelope addressed to a "Ronald R." at 1001 Ocala Road, containing a debit card representing a tax refund; the notebooks containing 50 lists of names with associated personal identification information, including social security numbers and dates of birth; four sets of employer ID numbers; and numerous unopened, addressed envelopes containing debit cards commonly used for tax refunds.  Defendant argued that this evidence did not meet Federal Rule of Evidence 404(b)'s standards for admission of extrinsic acts evidence, and that its admission would unfairly prejudice Defendant, in violation of Rule 403.  The gist of Defendant's argument was that while this material perhaps constituted evidence that he was engaged in tax fraud and in the identity theft connected with that fraud, it was not relevant to showing whether Defendant was guilty of conspiring to commit "food stamp" fraud, and the attendant identity theft, with which Defendant was charged.  The government disagreed and argued

7

that this evidence fit within the parameters of Rule 404(b) and that its probative value outweighed any prejudice to Defendant.

The district court engaged in a lengthy colloquy with counsel concerning this motion. Over the government's objection, the court declined to allow the latter to use this extrinsic evidence, in its entirety. Yet, given the fact that there was evidence that Defendant had given the 1001 Ocala Road address to Phanor for his use in the food stamp fraud and attendant identity theft scheme, given the fact that the Ronald R. tax refund debit card found in Defendant's car was in an envelope addressed to this same Ocala Road address, and finally given the fact that one of the 50 lists of personal identification information contained the personal information of "Ronald R.," these facts were probative of Defendant's knowing and intentional involvement in the conspiracy count in which he was charged. They were therefore also relevant in contradicting Defendant's defense that he was merely a buyer of one EBT card from Phanor, and was not otherwise involved in Phanor's broader "food stamp" fraud conspiracy.

## III.    Discussion

On appeal, Defendant argues that the district court abused its discretion by: (1) admitting into evidence, under Rule 404(b), the one list of names with personal identifying information and the one envelope addressed to "Ronald R." at Ocala Road; and (2) in denying his subsequent motions for mistrial.

8

A.    Admission of List and Envelope

We review the district court's admission of evidence under Rule 404(b) for a clear abuse of discretion. *United States v. Sterling*, 738 F.3d 228, 234 (11th Cir. 2013), *cert. denied*, 134 S. Ct. 2682 (2014). Under this standard, we affirm so long as the district court's decision was not based on a clear error of judgment or an application of the wrong legal standard. *See United States v. Matthews*, 431 F.3d 1296, 1312 (11th Cir. 2005).

Rule 404(b) provides that:

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

Fed. R. Evid. 404(b)(1). Such evidence, however, is admissible for other purposes, such as proving motive, intent, knowledge, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). We have held that evidence of a defendant's other crimes or acts is admissible under Rule 404(b) when: (1) it is relevant to an issue other than the defendant's character; (2) sufficient proof exists for a jury to find by a preponderance of the evidence that the defendant committed the acts in question; and (3) the probative value of the evidence is not substantially outweighed by undue prejudice under Federal Rule of Evidence 403. *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007).

When determining the probative value of extrinsic act evidence, we

9

consider:  (1) the government's incremental need for the evidence to prove guilt beyond a reasonable doubt; (2) the similarity of the extrinsic act and the charged offense; and (3) the closeness or remoteness in time between the extrinsic act and the charged offense.  *United States v. Ellisor*, 522 F.3d 1255, 1268 (11th Cir. 2008).  If extrinsic act evidence is essential to obtaining a conviction, it is more probative, and thus, more likely to be admissible.  *Sterling*, 738 F.3d at 238.  The risk of prejudice from extrinsic act evidence may be reduced by an appropriate limiting instruction.  *Ellisor*, 522 F.3d at 1268.

Rule 403 permits the district court to exclude relevant evidence when its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Exclusion of relevant evidence is an extraordinary remedy, though, and it should be used sparingly.  *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).  In conducting the Rule 403 analysis, we view any relevant evidence in the light most favorable to its admission, maximizing its probative value and minimizing any undue prejudicial impact.  *Id.*

Applying the above standards, we find no abuse of discretion in the admission, pursuant to Rule 404(b), of two of the items found in the search of Defendant's apartment and car:  (1) the envelope sent to "Ronald R." at the Ocala

Road address and (2) the one list of 25 names with personal identification information, including "Ronald R.'s" name and identifying information. Contrary to Defendant's argument, all three prongs of the Rule 404(b) admissibility test are met.

First, the above information was relevant to an issue other than Defendant's character. Specifically, the evidence was relevant in showing that Defendant conspired with and knowingly and intentionally participated in Phanor's SNAP fraud scheme. Of course, such participation and intent were necessary elements that the government had to prove, and Defendant's plea of not guilty put the government to its burden on all elements. *See United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (to obtain a conviction pursuant to 18 U.S.C. § 1349, the government must show Defendant knew of and willfully joined in the scheme to defraud); *see also Edouard*, 485 F.3d at 1345 (a defendant who pleads not guilty makes intent a material issue).

But beyond the general need of the government to prove all elements of the charged offenses beyond a reasonable doubt, there was a more specific need for the evidence here. Specifically, while Defendant had acknowledged that he might not have much of a defense as to the substantive wire fraud counts—because there seemed to be ample evidence that he knew that he was not "David. M," yet he used the latter's EBT card to make purchases—Defendant made clear that he was

11

vigorously challenging the contention that he had conspired with Phanor as to the overall food stamp fraud conspiracy. To the contrary, Defendant intended to argue that he was but a buyer of one fraudulently-obtained EBT card from Phanor—the David M. EBT card—and was not otherwise involved in Phanor's overarching conspiracy.

Given that defense strategy, tying Defendant to the 1001 Ocala Road address that the government contended he had given to Phanor to use to receive future fraudulent EBT cards was extremely important because, if proved, that act by the Defendant meant that Defendant had been more than a buyer of one EBT card. Instead, it would mean he had acted to further Phanor's food-stamp fraud conspiracy and scheme. Admission of the envelope addressed to "Ronald R." at 1001 Ocala Road and found in the possession of Defendant was relevant to this end. Further, Defendant's possession of this envelope addressed to "Ronald R." at Ocala Road, with the enclosed debit card to "Ronald R.," as well as the sheet with the list of personal identification information of 25 people, including "Ronald R.," also bolstered the government's argument that Defendant had not just helped Phanor in his conspiracy, but that he had done so knowingly and with the intent to assist Phanor's fraud scheme. That is, evidence that Defendant possessed this envelope addressed to a "Ronald R." at the same Ocala Road address he had given to Phanor, combined with Defendant's admission that he was aware that the list of

12

names, including "Ronald R.'s," was associated with some sort of fraudulent scheme, was evidence that strongly suggested Defendant's knowledge that Phanor would <u>not</u> be using this Ocala Road address that Defendant had provided him for a benign purpose. This is so, because, indeed, Defendant was not using the address for such a purpose.

In addition, the list of names was relevant to whether Defendant knew that the EBT card he used belonged to a real person, which the government had to prove in order to convict him of aggravated identity theft. *See Flores-Figueroa v. United States*, 556 U.S. 646, 647, 129 S. Ct. 1886, 1888 (2009). In his post-arrest statement, Defendant denied having any knowledge of "David M." Yet, the evidence of this list of names of real people, combined with Defendant's admission that he had been given the list of names with the understanding it would be used for some type of fraud and that he thought that some of the names on the list belonged to real people, was probative of an element that the government had to prove. Indeed, Defendant indicated his impression that one could discern that a name was not the name of a real person when the social security numbers were too long. In summary, this evidence was relevant to an issue other than Defendant's character.

Second, there was sufficient proof that Defendant committed the extrinsic act of possessing the Ocala Road envelope and the list of 25 names with the

13

knowledge that they were related to some sort of fraud. The list and envelope were found in Defendant's car and, in his post-arrest statement, Defendant admitted that he had provided the Ocala Road address to the person who had given him the list and had arranged for the envelope to be sent. Further, Defendant admitted that he had been given the list of names, with the understanding that it would be used for fraud and that, in fact, some of the names on the list belonged to real people.

Third, the evidence's probative value was not substantially outweighed by any undue prejudice as the envelope and list were extremely important to the government's case on the conspiracy and identity theft charges. *See Sterling*, 738 F.3d at 238. Again, the envelope was an important rebuttal to Defendant's argument that he was merely a buyer, and not a participant in the SNAP fraud scheme. The envelope tied Defendant to the Ocala Road address and corroborated the evidence that Defendant had provided Phanor with the Ocala Road address. From this evidence, the jury could conclude that Defendant intentionally participated in the conspiracy by giving the Ocala Road address to Phanor, not for an innocent purpose, but for use in the SNAP fraud scheme. The list was also probative because, given Defendant's argument that he did not know that "David M." was a real person, this element was particularly in play. Defendant told the investigating officer that he knew that some of the identities on the list of names were real and that it was somehow related to fraud. This evidence, in conjunction

14

with additional testimony about the application and verification process for obtaining SNAP benefits, was relevant in proving that Defendant knew that a real identity had been used to obtain the EBT card.

Finally, when the district court admitted the envelope and list, it gave an appropriate limiting instruction. Specifically, the jury was instructed that it was going to hear evidence about "acts of the defendant that may be similar to those charged in the indictment but may have been committed on other occasions" and that it could not "consider this evidence to decide if the defendant committed the acts charged in the indictment." The jury was further instructed that the evidence could only be considered to decide whether Defendant "had the state of mind or intent necessary to commit the crime charged in the indictment" or "committed the acts charged in the indictment by accident or mistake." This instruction minimized any unfair prejudice that might have resulted from admission of the list and the envelope.

In sum, all of the requirements of Rule 404(b) were met with respect to the list and the envelope. Consequently, Defendant has not shown that the district court's decision was based on a clear error of judgment.

B.    Motion for Mistrial

Defendant made two motions for mistrial during the trial, arguing that a comment by the prosecutor in his opening statement and a later statement by a

15

government witness went beyond the constraints that the district court had placed on use of the extrinsic evidence. We review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Ettinger*, 344 F.3d 1149, 1161 (11th Cir. 2003). A defendant is entitled to a grant of a mistrial only upon a showing of substantial prejudice. *Id.* If the district court gives a curative instruction, reversal is appropriate only if the evidence "is so highly prejudicial as to be incurable" by the district court's instruction. *United States v. Garcia*, 405 F.3d 1260, 1272 (11th Cir. 2005).

The district court did not abuse its discretion in denying Defendant's motions for a mistrial. First, the district court, which had articulated the boundaries for use of the extrinsic evidence, disagreed that the prosecutor had exceeded those bounds. Second, when read in context, the challenged statements did not tell the jury about the existence of the evidence excluded by the district court. The prosecutor, in his opening statement, said that, as to the aggravated identity theft count, the government "hope[d] to be able to point [the jury] to some statements [the defendant] made about the list*s* of names and identities that he had in the back seat of his car" to prove that Defendant knew that the EBT card he had used belonged to a real person. The subsequent discussion at the bench reflects that not even the parties at that time believed the prosecutor was referring to any list other than the one deemed admissible. Moreover, the court instructed the jury

16

that the statements made by the lawyers in opening or closing arguments were not evidence.  Likewise, the investigating officer's testimony about Defendant being "given . . . a bag of personal identification information containing this piece of paper and others" and being provided with "the names on this piece of paper and this amount of information in the bag" may have implied that there were other papers in the bag, but it did not suggest to the jury that those papers contained additional lists of names with identifying information.

Finally, contrary to Defendant's argument on appeal, the one list and envelope were not solely deemed admissible to show that Defendant knew that the EBT card he had used belonged to a real person.  Instead, the district court's ruling on the motion *in limine* and the jury instruction given upon the evidence's admission reflect that the evidence was also admitted to show Defendant's knowledge and intent to join the conspiracy.

For all of the above reasons, we affirm Defendant's convictions.

**AFFIRMED.**

17